**In re RBS INDUSTRIES, INC., d/b/a Milford Rivet & Machine Company, Modform, Interlock, Gary Screw & Bolt, Modulus, Debtor.**

**Bankruptcy No. 5–86–00345.**

United States Bankruptcy Court,
D. Connecticut.

June 28, 1990.

See also, Bkrtcy., 104 B.R. 579, 115 B.R. 417.

**420**

William F. Savino, Damon & Morey, Buffalo, N.Y., for Robert W. Raddatz, Plan Facilitator.

Andrew M. DiPietro, Jr., DiPietro, Kantrovitz & Brownstein, P.C., New Haven, Conn., for General Unsecured Creditors' Committee.

Paul E. Knag, Cummings & Lockwood, Stamford, Conn., for Raymark Industries, Inc., Raymark Corp., and Raymark Formed Product Co.

Jonathon M. Yarger, Kohrman, Jackson & Krantz, Cleveland, Ohio, for Jaclind Group, Inc., Milford Acquisition Co., and MRMC, Inc.

Maximino Medina, Zeldes, Needle & Cooper, Bridgeport, Conn., for Jaclind Group, Inc., Milford Acquisition Co., and MRMC, Inc.

## MEMORANDUM AND MODIFIED ORDER ON OBJECTIONS TO CLAIMS [1]

ALAN H.W. SHIFF, Bankruptcy Judge.

### I.

On July 20, 1983, Raymark Corporation, Raymark Industries, Inc., Raymark Formed Products Company, and Milford Rivet and Machine Company of Delaware (hereinafter collectively referred to as "Raymark") entered into an agreement with RBS Industries, Inc. ("RBS"), under which RBS agreed to purchase certain assets from Raymark. The purchase agreement contemplated an accounting of certain items at or after the closing on the sale. Pursuant to the purchase agreement,

on August 29, 1983, RBS paid Raymark $15,000,000.00 in cash; gave Raymark 40,000 shares of RBS non-voting 12% cumulative preferred stock with par value of $100.00; and gave Raymark a $3,000,000.00 non-interest bearing note payable on August 29, 1984. The note was secured by a deed of trust on real property located in Fullerton, California, which was purchased by RBS as part of the sales transaction.

When RBS failed to pay the note on August 29, 1984, Raymark commenced a foreclosure action in California state court on the Fullerton property. On April 17, 1985, RBS commenced an action in California state court against Raymark, alleging that Raymark had overstated inventory by approximately $3,000,000.00 and that it was owed approximately $6,000,000.00 under the accounting. RBS subsequently obtained an injunction halting the foreclosure action on the ground that its claim exceeded the value of the note. On December 2, 1985, Raymark filed a counterclaim in the RBS suit, alleging that RBS owed it $1,323,000.00 under the sale agreement (the "Raymark counterclaim").

On May 16, 1986, the debtor filed a petition under chapter 11 of the Bankruptcy Code. On October 24, 1986, Raymark Corporation, Raymark Industries, and Raymark Formed Products Company each filed a $4,323,000.00 proof of claim based on the note and the Raymark counterclaim. On September 1, 1989, an order entered confirming the Fourth Amended Joint Plan of Reorganization (the "Plan"), which was proposed by Seymour Specialty Wire Co., a creditor, and the Jaclind Group, Inc. The Plan is a so-called "liquidating pot plan" under which substantially all of RBS's assets were acquired by Milford Acquisition Company ("MAC"), a Delaware corporation, which was designated as Jaclind's nominee for that purpose. The proceeds of the sale of assets to MAC and the sale of all other assets were used to create a "Liquidation Fund", out of which secured, administrative, and priority claims were paid,

---

**1.** This Memorandum and Modified Order is based on a bench ruling. It is not a verbatim transcription of that ruling.

and unsecured claims are to be paid a pro rata dividend. Robert W. Raddatz was appointed as plan facilitator.

On November 17, 1989, the debtor filed an objection to the Raymark claims, asserting that it is not indebted to Raymark. The focus in this proceeding is a determination of who is liable for the Raymark counterclaim, the Liquidation Fund or Jaclind, MAC, and MRMC, Inc., MAC's successor (hereinafter collectively referred to as the "Purchasers").

▮▮▮ Raddatz and the unsecured creditors' committee argue that the Purchasers purchased RBS's California litigation against Raymark subject to the Raymark counterclaim, so that the Purchasers are responsible for that counterclaim. The Purchasers contend that the Raymark counterclaim is an unsecured claim which is to be paid out of the Liquidation Fund.[2] They recognize that they took the California litigation subject to the Raymark counterclaim, but argue that they did not intend to assume the counterclaim as an independent obligation. The Purchasers attempt to buttress their position with the argument that the Plan does not specifically provide for their assumption of an obligation to pay unsecured, pre-petition claims relating to any counterclaims and by the fact that the Plan states that the Purchasers were to assume only certain specified obligations and liabilities, which did not include the Raymark counterclaim. Raymark maintains that the Purchasers are liable for its counterclaim, but that if it is unable to collect on any judgment, it should be paid from the Liquidation Fund.[3]

## II.

The instant controversy is governed by general contract principles. *In re L & V Realty Corp.*, 76 B.R. 35, 37 (Bankr.E.D.N.Y.1987); *Matter of United Merchants and Manufacturers, Inc.*, 24 C.B.C. 220, 226 (Bankr.S.D.N.Y.1981) ("At its simplest, a plan is an offer of promises made by a debtor and accepted by the creditors following serious and frequently protracted negotiations. In many of its most vital aspects, a plan is a kind of contract involving, as it does, matters of offer, acceptance, performance and the like.").

▮▮▮ Contracts are to be construed in a way that effectuates the intent of the contracting parties. *Sturman v. Socha*, 191 Conn. 1, 10, 463 A.2d 527 (1983); *Ginsberg v. Mascia*, 149 Conn. 502, 505–06, 182 A.2d 4 (1962). Where the parties' agreement is in writing, their intention is to be determined from the language of that writing rather than on the basis of any intention one of the parties may have silently entertained. *Sturman, supra,* 191 Conn. at 10, 463 A.2d 527; *Robert Lawrence Assoc., Inc. v. Del Vecchio,* 178 Conn. 1, 14, 420 A.2d 1142 (1979). Thus, the " 'question is not what intention existed in the minds of the parties but what intention is expressed in the language used .... ' " *White Oak Corp. v. State of Conn.,* 170 Conn. 434, 439, 365 A.2d 1162 (1976) (quoting *Anderson v. Pension & Retirement Bd.,* 167 Conn. 352, 354, 355 A.2d 283 (1974)). The language used in an agreement must be given its common, ordinary, natural meaning and usage where that meaning or usage can be sensibly applied to the subject matter of the agreement. *Sturman, supra,* 191 Conn. at 10, 463 A.2d 527; *Mar-*

---

**2.** Raddatz and the unsecured creditors' committee contend that the Raymark counterclaim is secured as the result of a February 9, 1988 § 1111(b) election by Raymark. However, even assuming the election applied to the Raymark counterclaim, that election was made when a plan substantially different in its terms and proposed by the debtor and another entity was pending, and Raymark subsequently withdrew the election on June 10, 1988. *See In re Century Glove, Inc.,* 74 B.R. 958, 961 (Bankr.D.Del.1987); *In re Keller,* 47 B.R. 725, 730 (Bankr.N.D.Iowa 1985) ("A material alteration of the Plan by the Debtor is tantamount to filing a different plan

and if a material alteration is made it would be inequitable not to allow a creditor to fully evaluate the proposal and determine whether it wished to elect treatment under § 1111(b).").

**3.** The order confirming the Plan provides that this court retained jurisdiction to rule on objections to claims and determine all controversies arising under the Plan, and I conclude that I have jurisdiction to rule on this matter. *See* 28 U.S.C. § 157(b)(2)(A), (C); *In re Johns–Manville Corp.,* 97 B.R. 174, 180 (Bankr.S.D.N.Y.1989).

*cus v. Marcus*, 175 Conn. 138, 141–42, 394 A.2d 727 (1978). An agreement is to be construed as a whole, and all relevant provisions will be considered together and given effect if possible. *Lar–Rob Bus Corp. v. Town of Fairfield*, 170 Conn. 397, 407, 365 A.2d 1086 (1976); *Texaco, Inc. v. Rogow*, 150 Conn. 401, 408, 190 A.2d 48 (1963). If the terms of an instrument are fairly susceptible to two or more interpretations, the one which is the more equitable, reasonable and rational is preferred. *Lanna v. Greene*, 175 Conn. 453, 458–59, 399 A.2d 837 (1978); *Texaco, Inc., supra*, 150 Conn. at 408, 190 A.2d 48.

Paragraph 1.67 provides:

> All claims, suits and actions ... by RBS against anyone, including without limitation the Raymark Group, Henry, and Raytech Corporation, shall be acquired by MAC subject to all applicable defenses, counterclaims and setoffs (the "Purchased Suits"); provided, however, that if MAC elects in its sole discretion not to acquire any claim, suit or action by RBS against any person (the "Remaining Suits"), such Remaining Suits shall remain the property of RBS for disposition by the Plan Facilitator as described below.

Paragraph 1.50 of the Plan provides in part:

> · The Secured Claim of the Raymark Group is unimpaired. MAC will acquire RBS's claims, defenses and counterclaims in ... the California Action.... At the Closing, MAC shall take the Fullerton Realty subject to the mortgage securing this disputed Secured Claim.

Thus, absent more, ¶¶ 1.67 and 1.50 indicate that the Purchasers assumed any liability on the Raymark counterclaim.

Paragraph 3.5 provides in relevant part:

> MAC shall assume only, and the Confirmation Order shall so expressly provide, the following obligations and liabilities, and otherwise takes the Purchased Assets free and clear of all debts, obli-

gations and liabilities whatsoever of RBS:

> ....

> (3) The mortgage against the Fullerton Realty.

Thus, ¶ 3.5 is in conflict with ¶¶ 1.50 and 1.67.

■■■■■ A proof of claim which is properly filed constitutes prima facie evidence of the validity and amount of a creditor's claim. *Central Rubber Prod. v. Stafford Higgins Indus., Inc. (In re Central Rubber Prod., Inc.)*, 31 B.R. 865, 867 (Bankr.D. Conn.1983). A debtor or trustee has the initial burden of going forward with evidence in rebuttal of the creditor's claim. *Id.* However, the creditor has the ultimate burden of proving its claim by a fair preponderance of the evidence. *Id.* Here, the Purchasers have joined Raymark in opposing the objections to the Raymark claims and have an identity of interest with Raymark in showing that the Raymark claims are valid. Therefore, the Purchasers carry the same burden of proof by a fair preponderance of the evidence as does Raymark.

■■■■ Attorney Peter Baylor, who represented Jaclind during the formulation and confirmation of the Plan, claims that Jaclind intended through ¶ 3.5 to limit its exposure in the California litigation to the value of the Fullerton real estate. His claim is contradicted by several factors.

First, it is clear that the Purchasers bought a package, which includes the RBS claim against Raymark and the Raymark counterclaim. The claim and counterclaim are inextricably intertwined. Indeed, Attorney Baylor admitted during cross-examination that he believed that the principle of set-off was applicable in the California litigation and that the Purchasers would be entitled only to the net of any judgment less the counterclaim.[4] This admission acknowledges that the Purchasers are in fact liable for the counterclaim. If they were not, the Purchasers could take a judgment on the claim free and clear of liability on

---

**4.** *See Hughes Tool Co. v. Max Hinrichs Seed Co.*, 112 Cal.App.3d 194, 169 Cal.Rptr. 160, 163 (1980).

the counterclaim, and that liability would go to the Liquidation Fund.

Second, ¶ 3.2(1) specifically provides that the consideration for the acquisition of RBS's assets includes the assumption of the "Raymark Group Claim". As the Raymark $4,323,000.00 proofs of claim make clear, the Raymark counterclaim is included in the "Raymark Group Claim".[5]

Finally, Attorney Baylor admitted that the Raymark counterclaim is an unsecured claim. Had Jaclind intended to provide that the Raymark counterclaim was to participate in the distribution to unsecured creditors, the Plan would have so specified. Unsecured creditors are treated in Class 15 of the Plan. Paragraph 1.44 of the Plan states that "RBS estimates that Unsecured Claims not entitled to priority total approximately $9.4 million." The Restated Disclosure Statement, *MRMC* Exhibit I at 6–7, provides that $600,000.00 will be distributed to class 15 unsecured creditors, that the unsecured claims total approximately $9,406,000.00, that those claims consist of trade creditors, union obligations, and obligations to the "4049 Trustee", and that unsecured creditors will receive a dividend of 6.38%. Attorney Baylor admitted that an agreed upon goal of Jaclind, RBS, and the unsecured creditors' committee was that the Class 15 unsecured creditors receive a dividend of at least 6%. The Raymark counterclaim is not included in that calculation. If the Raymark counterclaim were added to the Class 15 unsecured claims, the total of those claims would be increased to $10,729,000.00 and the dividend to that class decreased to 5.59%.[6]

I conclude that the Purchasers and Raymark have failed to sustain their burden of proof; that the Purchasers are liable for the Raymark counterclaim; and that the Liquidation Fund has no liability in connection with that counterclaim.

### III.

For the foregoing reasons, the objections to the Raymark claims are SUSTAINED, those claims are DISALLOWED, and IT IS SO ORDERED.

---

5. The bench ruling did not specifically refer to ¶ 3.2(1) of the Plan.

6. In the bench ruling, I made reference to ¶ 1.28 of the Plan. Upon further review of all of the documents entered into evidence, I conclude that that provision is not relevant.