In re PARADISE SPRINGS AS-
SOCIATES, a Utah limited
partnership, Debtor.

The MUTUAL LIFE INSURANCE
COMPANY OF NEW YORK,
Movant,

v.

PARADISE SPRINGS ASSOCIATES,
a Utah limited partnership,
Respondent.

Bankruptcy No. B91–13785–PHX–RGM.
Adv. No. 93–194.

United States Bankruptcy Court,
D. Arizona.

Oct. 25, 1993.

914

Charles G. Case, II, Laurie Shough, Phoenix, AZ, for debtor.

**916**

Patrick Hoog, Eugene O'Connor, Phoenix, AZ, for Mut. Ins. Co. of New York.

### ORDER DENYING CONFIRMATION OF PLAN OF REORGANIZATION

DONALD MacDONALD IV, Bankruptcy Judge.

#### Table of Contents

I.    Introduction . . . . . . . . . . . . . . . . . .916
II.   MONY's § 1111(b)(2) Election . . .916
    A.  Background of MONY's claim and the § 1111(b) election . . . . . . . . . . . . . . . .916
    B.  Can a creditor make a conditional § 1111(b)(2) election or make the § 1111(b)(2) election under protest? . . . . . . . . . . . . .917
    C.  May a creditor withdraw a § 1111(b)(2) election? . . . . .918
III.  MONY's "Undersecured" B Loan Claim . . . . . . . . . . . . . . . .920
IV.  The Plan Has Been Proposed in Good Faith . . . . . . . . . . . . . . .921
V.   Value of the Apartment Complex . . . . . . . . . . . . . . . . . . . . . . .922
VI.  Treatment of the Post–Petition Rents . . . . . . . . . . . . . . . . . . . . . .924
VII.  Interest Rate and Feasibility . . .926
    A.  Interest Rate . . . . . . . . . . . . . .926
    B.  Feasibility . . . . . . . . . . . . . . . . .928
VIII. Conclusion and Order . . . . .: . . . . .929

#### I. *Introduction*

W. Spence Clark, a resident of Salt Lake City, Utah, was a general partner, along with 65 limited partners, in a posh 200-unit Phoenix apartment complex named Paradise Springs. Clark and his corporation, Clark Financial Corporation ("CFC"), were involved with many limited real estate partnerships throughout the United States. Clark and CFC filed chapter 11 in Utah. Clark's partnership, Paradise Springs Associates, filed for Chapter 11 relief in Arizona on November 22, 1991. Through a series of events in the Clark CFC bankruptcy, Montford Investors Recovery, Inc. ("MIRI"), a Texas corporation, became acting substitute general partner for Paradise Springs. MIRI is prosecuting this proceeding for the debtor.

The debtor's plan of reorganization was filed May 22, 1992, and went to hearing on confirmation on June 7 through June 11, 1993.

Mutual of New York ("MONY") is the only creditor opposing confirmation. MONY originally loaned $7,250,000.00 to the debtor and has made additional advances. All other classes of claims have approved the plan. Extensive post-trial briefs have been submitted and the case is ready for decision.

Because several of the issues raised by the parties become irrelevant once the issues surrounding MONY's § 1111(b) election are resolved, the § 1111(b) issues will be the first reviewed.

#### II. *MONY's § 1111(b)(2) Election*

##### A. *Background of MONY's claim and the § 1111(b) election:*

On December 16, 1984, Paradise Springs Associates was extended a loan in the principal sum of $7,250,000. This loan was secured by a deed of trust and assignment of rents on the Paradise Springs Apartment Complex and an assignment of lessor's interest in leases on the complex. The beneficial interest in the note, deed of trust, and assignment of lessor's interest was assigned to MONY by assignment recorded December 5, 1988. As of the date Paradise Springs filed its petition, November 22, 1991, the entire principal amount of the note was due MONY. Including interest, fees and other costs, the total prepetition amount due MONY on the deed of trust note was $7,623,218. MONY's claim that it is also owed $175,173 on account of a separate, unsecured "B" loan will be discussed later.

Paradise Springs filed a Plan of Reorganization dated May 22, 1992. The plan placed MONY's claim alone in Class 3, and provided alternate treatment for MONY's secured claim with and without the § 1111(b)(2) election. In the event MONY did not make the § 1111(b)(2) election, the plan placed MONY's unsecured deficiency claim by itself in Class 4. Other unsecured claims were classified in Classes 5a (non-insider recourse unsecured claims) and 5b (insider recourse unsecured claims).

On August 26, 1992, MONY filed a notice of conditional § 1111(b)(2) election. In the notice, MONY said its election "shall be deemed made only in the event that this

Court determines that the separate classification of MONY's unsecured claim from the claims of other unsecured creditors is permissible, and that the plan is confirmable." At the same time MONY filed its conditional election, it also filed a motion for extension of time to elect under § 1111(b)(2).

MONY's motion for extension of time was considered by Judge Mooreman on September 14, 1992, at the same time as the final hearing on MONY's motion for relief from stay and a continued disclosure statement hearing were held in this case. MONY was denied relief from stay. Judge Mooreman found that the debtor's plan appeared confirmable. He took issue with the interest rate the plan proposed, but left that issue to be resolved at the confirmation hearing. He continued the hearings on the disclosure statement and MONY's motion for extension of time to October 21, 1992.

At the October 21, 1992 hearing, Judge Mooreman continued the disclosure statement hearing to November 24, 1992. He took MONY's motion for extension of time under advisement but subsequently ruled that cause did not exist to extend the period of time for MONY to elect § 1111(b)(2) treatment. He also found the proposed disclosure statement set forth alternative treatments for MONY with or without the election. MONY's motion for extension of time to make the election was denied.

On December 30, 1992, MONY filed its notice of § 1111(b)(2) election under protest. MONY contended that until the court ruled on whether the debtor's separate classification of MONY's unsecured claim from the claims of other unsecured creditors was permissible, MONY could not make an informed decision regarding the plan. MONY said it was "being compelled to make its election before the Bankruptcy Court ruled on the legality of Debtor's classification of claims and the confirmability of Debtor's Plan."

B. *Can a creditor make a conditional § 1111(b)(2) election or make the § 1111(b)(2) election under protest?*

The Bankruptcy Code and Rules contemplate a binding election. Rule 3014 says the § 1111(b)(2) election may be made at any time before the conclusion of the hearing on the disclosure statement. Rule 3014 also provides that the election "shall be binding [on the electing creditor] with respect to the plan."

The Advisory Committee Note to Rule 3014 provides, in part:

> Generally it is important that the proponent of a plan ascertain the position of the secured creditor class before a plan is proposed. The secured creditor class must know the prospects of its treatment under the plan before it can intelligently determine its rights under § 1111(b). The rule recognizes that there may be negotiations between the proponent of the plan and the secured creditor leading to a representation of desired treatment under § 1111(b). *If that treatment is approved by the requisite majorities of the class and culminates in a written, signed statement filed with the court, that statement becomes binding and the class may not thereafter demand different treatment under § 1111(b) with respect to that plan.* The proponent of the plan is thus enabled to seek approval of the disclosure statement and transmit the plan for voting in anticipation of confirmation. Only if that plan is not confirmed may the class of secured creditors thereafter change its prior election.

*Collier on Bankruptcy,* Appendix Vol. 1 at p. 1406 (15th Ed.1993) [emphasis added].

Only one published decision discusses a conditional § 1111(b)(2) election. In *In re Western Real Estate Fund, Inc.,* 83 B.R. 52, 55 (Bankr.W.D.Okla.1988), a conditional election was filed by Transamerica Occidental Life Insurance Co. in which "it declined to have its claim treated as fully secured in the event the court determined that the debtor could not eliminate the unsecured portion of its claim through a proposed future sale." The court denied confirmation of the debtor's plan because it contained the provisions stated in Transamerica's conditional election. The court directed the debtor to give creditors additional time to make a § 1111(b)(2) election and to modify the plan so that if such election was not made, the creditors would be given creditor debentures in an amount equal

to the unsecured portion of their claim. The debtor filed an amended plan, which the court confirmed. Transamerica filed an unconditional § 1111(b)(2) election more than a month after the amended plan was confirmed.

The court found that Transamerica's second election was untimely. With respect to the first, conditional election, the court stated it "became an election not to be granted [§ 1111(b)(2) ] treatment" when the court denied confirmation of the plan and directed the debtor to modify it. *Id.*

In this case, MONY based its "conditional" and "under protest" § 1111(b)(2) elections on two grounds. First, MONY contended the plan improperly classified its unsecured claim in a separate class. There is a split of authority on this issue. In one recent decision, *In re D & W Realty Corporation*, 156 B.R. 140 (Bankr.S.D.N.Y.1993), the court held that separate classification of an undersecured creditor's claim is not only appropriate, but mandated to ensure that creditor's right to make a § 1111(b) election.

■ MONY's second ground for the "conditional" and "under protest" elections was that its election should only be effective in the event the court determined that Paradise Spring's plan was confirmable. This condition clearly is not contemplated by Rule 3014, which provides that the time for making a § 1111(b)(2) election expires on the conclusion of the hearing on the disclosure statement, absent an extension by the court. Further, it could be said that Judge Mooreman dealt with MONY's concern in his under advisement ruling of September 14, 1992, which indicated that the debtor's plan appeared confirmable.

■ MONY filed both the "conditional" and "under protest" elections in connection with the same plan, the one dated May 22, 1992. MONY's first, "conditional" election was superseded by the one "under protest," which was filed prior to the conclusion of the disclosure statement hearing. Because Rule 3014 contemplates a binding election, and because MONY's "under protest" election was filed after Judge Mooreman denied

MONY's request for extension of time to make the election, the election is binding.

### C. *May a creditor withdraw a § 1111(b)(2) election?*

Although neither the Code nor the Rules discuss withdrawal of a § 1111(b)(2) election, every published decision which has considered the issue has determined that such an election can be withdrawn by the electing creditor, provided there has been a material modification of the plan under which the election was made subsequent to the time the creditor made the election.

An early case commonly cited with approval by other courts which have considered the issue is *In re Keller,* 47 B.R. 725 (Bankr. N.D.Iowa 1985). In that case, the court stated:

> Once a class of secured creditors has elected treatment under § 1111(b) it cannot thereafter "unelect" with respect to the particular plan proposed at the time the election was made. To allow a creditor to withdraw its election would allow it to materially alter the Debtors' prospects of confirmation as it would dramatically alter the Debtors' negotiating position with its other creditors. Once the election has been made the Debtors and other creditors should be allowed to rely upon the election so long as the plan is not materially altered by the Debtor. A material alteration of the Plan by the Debtor is tantamount to filing a different plan and if a material alteration is made it would be inequitable to not allow a creditor to fully evaluate the proposal and determine whether it wished to elect treatment under § 1111(b). The definition of a material alteration is not capable of precise definition and may be likened to Justice Potter Stewart's comments regarding obscenity, "I know it when I see it...." Beyond such an ambiguous definition this Court shall not venture.

*Id.* at 730 [citations omitted].

In *Keller,* the secured creditor was not permitted to withdraw its § 1111(b)(2) election. The creditor filed its election after the debtor had filed an amended disclosure statement. The amended disclosure statement

was subsequently approved by the court. Two months later, after balloting on the plan had occurred, the secured creditor moved to withdraw its election, saying that after studying the full implications of its election, it had decided the election was not in its best interests. The secured creditor also contended the debtor should have amended its plan and disclosure statement to reflect that it had made the election. The court found that no material modifications had been made to the plan since the creditor had made its election. Further, since none of the other affected creditors had timely objected to the disclosure statement, the court would not require the debtor to amend the disclosure statement and have the creditors "revote," as this would be "tantamount to allowing [the electing creditor] to request that the Debtors have the Plan accepted by the unsecured creditors twice ... a result never intended by the drafters of the Code." *Id.* at 730.

By contrast, in *In re Century Glove, Inc.,* 74 B.R. 958 (Bankr.D.Del.1987), the court determined that an electing creditor (FAB) should be given an opportunity to change its prior election. In that case, the two debtors involved [one was guarantor of a loan to the other debtor] proposed to treat FAB in a manner differently from that specified in the plan. The court found that the debtors were taking certain portions of the plan "out of context" to significantly alter the treatment of FAB. After referring to the Advisory Committee Note to Rule 3014 and the *Keller* case, the court concluded

> FAB elected to be treated as a secured creditor for the full amount of its claim based upon the treatment proposed by debtors for FAB in their original plans. The debtors cannot now circumvent the effect of that election and change their proposed treatment of FAB without formally modifying their plans to specify the intended treatment of FAB. Upon modification, FAB must be given the opportunity to reconsider its prior election.

*Century Glove,* 74 B.R. at 962.

Two additional cases which have followed the "material alteration" standard of *Keller* are *In re RBS Industries, Inc.,* 115 B.R. 419, 421 n. 2 (Bankr.D.Conn.1990), and *Matter of*

*IPC Atlanta Ltd. Partnership,* 142 B.R. 547 (Bankr.N.D.Ga.1992) [the court found that modifying a plan to correct a clerical error and to specify the manner in which postpetition rents would be applied to the electing creditor's claim did not amount to material modifications which would permit withdrawal of the election].

Finally, in *In re Bloomingdale Partners,* 155 B.R. 961 (Bankr.N.D.Ill.1993), the court denied a creditor's motion to withdraw its § 1111(b)(2) election. The court stated the election would be binding unless the proposed plan modification was "prejudicial to the electing class and [was] of a nature that would lead a hypothetical reasonable investor typical of holders of claims in that class to reconsider its election." *Id.* at 971. It found that the plan had not been modified in this manner. The court noted that a creditor could also be permitted to withdraw its election if a disclosure statement was materially inadequate or was materially altered to comply with a plan modification. *Id.* The moving creditor contended the efforts of the debtor's general partners to purchase the claims of two unsecured creditors should have been contained in the disclosure statement. The court rejected this argument because it found the creditor had independent knowledge of the partners' negotiations regarding the unsecured claims prior to the time it had made its election. The creditor was not permitted to withdraw its election.

■ In this case, MONY filed both elections with regard to the same plan, i.e., the plan dated May 22, 1992. MONY claims it should be permitted to withdraw its election because of "material changes in the factual predicates underlying the Debtor's Plan." These material changes, which MONY says occurred or were discovered one week before the confirmation hearing, include the debtor's reworking of its income and expense projections and changes in payments to MONY; the debtor's change in the valuation of the apartment complex from $6.3 million to $6.75 million; the debtor's amendment of its schedules of unsecured creditors to increase Class 5A unsecured creditors by more than 600%; MONY's discovery that the debtor's new general partner and property manager were

both insolvent; and the debtor's installation of an affiliate as its property manager at a fee higher than market rate, without court approval.

None of these changes are so material as to "be tantamount to filing a different plan" or so "objectively and materially adverse" to MONY that it should be permitted to change its election. The debtor's increase in valuation of the apartments is to MONY's benefit, rather than detriment. The increase of the Class 5A unsecured creditors does not affect MONY because it made the § 1111(b) election and its deficiency claim was placed in a separate class. The other factual changes alleged by MONY have more to do with the feasibility of the plan than any change in MONY's treatment under the plan.

Because the debtor's plan has not been materially altered since MONY made its § 1111(b)(2) election, it cannot withdraw the election.

III. *MONY'S "Unsecured" B Loan Claim*

■ In addition to the $7,250,000 secured loan extended to Paradise Springs in 1986, MONY contends it holds another, unsecured claim in the amount of $175,173 on account of funds it advanced in 1990 for payment of delinquent real property taxes. The only document submitted by MONY in support of this unsecured claim is a letter from MONY to Paradise Springs dated May 30, 1990 (Stipulated Exhibit 19). The letter references the MONY loan secured by the Paradise Springs Apartments, and advises that MONY "advanced $340,675.35 to pay delinquent 1987 through 1989 real estate taxes" on the apartments. The letter says the advance will be set up as a "B" loan, to accrue interest at 14% per annum, and establishes a separate repayment schedule for the sums advanced. The last sentence of the letter states "[a] default under this agreement shall be deemed a default under the loan documents."

MONY's argument that it holds a separate, unsecured claim is totally unpersuasive. The letter which it claims evidences this separate loan not only references its initial, secured loan on the Paradise Springs Apartments, it also indicates that a default under the letter agreement would be considered a default under the "loan documents." Since the letter is the only evidence of this "unsecured" loan, the "loan documents" to which the letter refers can only mean the original promissory note and deed of trust on MONY's secured claim. The deed of trust contains standard language which permits MONY to make advances for taxes, which sums will be secured by the deed of trust. The fact that the parties apparently agreed to a different repayment schedule for the advances does not convert them into a separate, unsecured loan. MONY places importance on the fact that the "B" loan had a different interest rate than the deed of trust loan. However, this "separate" interest rate for the "B" loan is simply the default rate established by the terms of the secured loan (See Stipulated Exhibit 1, p. 2.)

It is unbelievable that a lender of MONY's sophistication would extend an unsecured loan of this size to Paradise Springs on the basis of a unilateral letter, and without security. The loan evidenced by MONY's letter is clearly an advance to pay taxes on the real property which is MONY's collateral under the deed of trust. But for MONY's security interest in the apartment complex, MONY would not have advanced these taxes.

■ MONY's contention that it holds an unsecured claim is simply an attempt to avoid the consequences of its § 1111(b) election. Because MONY lost the ability to vote its sizeable deficiency claim when it made the election, it has fabricated an unsecured claim out of a tax advance. I conclude that MONY holds only one claim, a secured claim evidenced by the note, deed of trust and assignment of deed of trust which are stipulated Exhibits Nos. 1, 2 and 5. Combining the amounts MONY calculates it is owed on its secured and B loans as of the date of the petition (see MONY Exhibit 39), MONY's total claim as of the date Paradise Springs filed bankruptcy is $7,798,391.00. Further, because MONY has made a § 1111(b) election, which it cannot withdraw, MONY has no unsecured claim. With no unsecured claim, MONY's confirmation arguments relative to the new value exception to the abso-

lute priority rule are moot. MONY has no standing to raise those issues.

## IV. *The Plan Has Been Proposed in Good Faith*

■ MONY argues that the plan in this case has been proposed in bad faith. 11 U.S.C. § 1129(a)(3) allows the court to confirm a plan only if it "has been proposed in good faith and not by any means forbidden by law." To satisfy the requirement of good faith, the proposed plan "must be intended to achieve a result consistent with the objectives of the Bankruptcy Code." *In re Corey,* 892 F.2d 829, 835 (9th Cir.1989) [citations omitted], *cert. denied,* 498 U.S. 815, 111 S.Ct. 56, 112 L.Ed.2d 31 (1990). The court assesses the plan proponent's good faith under the totality of the circumstances. *In re Stolrow's, Inc.,* 84 B.R. 167, 172 (9th Cir. BAP 1988).

■ MONY's assertions of bad faith are not supported by the record. For example, MONY contends indicia of bad faith can be found by reviewing how MIRI became involved in this case, and MIRI's motives for involvement. The evidence fails to support MONY's arguments.

MIRI, a Texas corporation, become involved in this case after the plan dated May 22, 1992, which is before this court for confirmation, had been filed. In August 1992, MIRI had several meetings in Salt Lake City with members of the creditors committees for the Spence Clark and CFC Chapter 11 estates. MIRI attended these meetings at the request of the committees, who were interested in obtaining a substitute general partner for the residential limited partnerships in which Clark and CFC had been involved. Several other potential candidates for substitution also attended these meetings. MIRI was selected by the committees as the preferred substitute, but before substitution could be formally accomplished, a creditor moved to have a Chapter 11 trustee appointed in the Clark and CFC cases. Clark and CFC agreed to the appointment of a Chapter 11 trustee, and one was appointed.

A group called the "Defense Fund" was formed to protect the interests of the limited partners involved in the Clark and CFC bankruptcies, particularly with reference to issues involving the residential limited partnerships in which Clark and CFC had been serving as general partners. The Defense Fund was particularly concerned with the adverse tax consequences which the limited partners would suffer if the residential properties involved were foreclosed. The Defense Fund wanted to find a replacement general partner for the residential limited partnerships.

After the Chapter 11 trustee was appointed in the Clark and CFC cases, MIRI negotiated with the Defense Fund to substitute in as general partner for several of the limited partnerships, including Paradise Springs. The Defense Fund solicited the votes to substitute MIRI as general partner. Initially, the Chapter 11 trustee in the Clark and CFC cases objected to the substitution, but ultimately an agreement was reached in which the trustee permitted MIRI to substitute in as general partner in 19 limited partnerships. This agreement was approved in October 1992 by the bankruptcy court for the Clark and CFC cases.

MIRI's conceded purpose for getting involved in these cases was to make a profit. MIRI found the Paradise Springs complex attractive because the market for this type of property was improving in Phoenix. The complex has been operating at almost full occupancy and MIRI expects the rents from the complex to increase 10% over the next year.

In spite of MONY's assertions to the contrary, nothing in the events surrounding MIRI's involvement in this case compels a conclusion that the plan has been proposed in bad faith. MIRI's involvement succeeded, rather than preceded, the filing of the plan which is before this court for confirmation. MIRI became involved in this case at the request of concerned creditors and limited partners in the Clark and CFC bankruptcies. MIRI's profit motive reflects an investment decision, rather than bad faith.

■ MONY also argues that MIRI's placement of its own property management company, Parkford Management, on the Paradise Springs project is evidence of bad faith,

and takes issue with the management fee being charged by Parkford. However, the agreement between MIRI and the Defense Fund permits MIRI, or an affiliate, to be paid a 6% management fee for the first two years of that agreement, and 5% thereafter. Testimony at the confirmation hearing established that property management fees in Phoenix presently range from 4% to 6%. MONY does not claim, nor is there evidence, that Parkford is improperly managing the property. In fact, when Parkford assumed management responsibilities it retained several employees who had been managing the property for Clark and CFC. Parkford's assumption of management for the complex does not reflect bad faith.

■ MONY suggests that MIRI's decision not to pursue recovery of prepetition transfers to Clark and CFC reflects bad faith. MONY says at least $250,000.00 in prepetition fraudulent transfers were made to Clark, CFC, and another related entity, Clark Financial Management Group. All three of these entities have filed bankruptcy. The claims pending against the Clark and CFC estates range from $15,000,000 to $40,-000,000. Under the circumstances, MIRI's decision not to pursue recovery of the prepetition transfers seems reasonable.

■ MONY also contends MIRI is insolvent, noting that funds which MIRI has been required to pay under the terms of the agreement approved by the court in the Clark and CFC bankruptcies have been paid by sources other than MIRI. MONY's argument seems to be that since MIRI itself is not at risk, MIRI must be proceeding in bad faith. MIRI's obligations under the agreement have been financed by other investors. However, the fact remains that MIRI has met its obligations, including a cash payment of $1,000,000.00 in the Clark and CFC bankruptcies. I believe the testimony of B.M. Miller, Executive Vice President of MIRI, regarding its financial capabilities. As with its profit motive, MIRI's risk factor reflects an investment decision, rather than bad faith.

MONY's other bad faith arguments can be dealt with summarily. MONY's claim that the pre-petition transfers precipitated the Paradise Springs bankruptcy cannot reflect bad faith on MIRI's part, because MIRI had nothing to do with these transfers. Further, this argument would be relevant to whether the petition was filed in good faith, which is distinguishable from the good faith requirement for plan confirmation. *Stolrow's*, 84 B.R. at 171.

■ MIRI's intent to cram down MONY's claim is not evidence of bad faith. The plan contained a cramdown provision before MIRI became involved as a substitute general partner. Since cramdown is permitted by the Code, the fact that the plan takes advantage of this remedy does not, by itself, reflect bad faith.

■ Finally, MONY claims MIRI's amendment of the schedules just before the confirmation hearing to add unsecured creditors, particularly Clark Financial Corporation Pooled Investment Fund I, is bad faith. MONY says the CFC Pooled Investment Fund I debt actually represents funds which were "stripped from the debtor" prepetition. This argument is specious. The claim of CFC Pooled Investment Fund I is described in the amended disclosure statement, and testimony at confirmation established that this was an unsecured loan to Paradise Springs from a Utah limited partnership formed in 1987.

In spite of MONY's assertions to the contrary, the evidence produced at confirmation does not support a finding of bad faith. MIRI's goals and conduct in this case have not been inconsistent with the objectives of the Code. Accordingly, I conclude that the plan complies with the requirements of § 1129(a)(3).

## V. *Value of the Apartment Complex*

Paradise Springs is a 200–unit apartment project located in North Phoenix. It consists of 17 two-story, stucco/frame buildings built in 1984. There are 3 floor plans: 1 bedroom, 1 bath, 702 square feet (56 units); 2 bedroom, 2 bath, 928 square feet (50 units); and 2 bedroom, 2 bath units containing 1,002 square feet (94 units). The project has two heated swimming pools, two laundry rooms, two hot tubs, extensive landscaping, and one

covered parking space per unit. It is located near the Paradise Valley Mall, a popular shopping center.

The trial testimony centered around the parties' two experts: Richard Kalinowski of Burke–Hansen for MONY and Dan Poulos of Arthur Anderson & Company for the debtor.

Kalinowski's April 23, 1993 appraisal was $7,230,000.00, up nearly $900,000.00 from his initial January 24, 1992 appraisal. Poulos came in at $6,750,000.00. He made no prior appraisal. A summary of the valuation information presented by Kalinowski and Poulos, as well as others, is set forth in the following chart:

| DATE | SOURCE | AMOUNT | COST APP. | INCOME CAPITALIZA- TION APP. | COMPARABLE SALES APP. (Unit Costs) | UNIT VALUE |
|---|---|---|---|---|---|---|
| 08/10/84 [1] | Public records | $10,500,000 | N/A | N/A | N/A | $52,500 [2] |
| 09/16/86 | Nelson MAI | $9,525,000 | $9,750,000 | $9,525,000 | $9,525,000 | $47,439 |
| 01/24/92 | Kalinowski MAI | $6,340,000 | $7,625,000 | $6,340,000 | $6,500,000 | $32,500 |
| 04/23/93 | Kalinowski, MAI | $7,230,000 | N/A | $7,230,000 | $7,200,000 | $36,000 |
| 05/07/93 | Dan Poulos, MAI candidate | $6,750,000 | $6,930,000 | $6,740,000 | $6,800,000 | $35,000 |
| 05/13/93 | REITCAL [3] offer of purchase | $7,250,000 | N/A | N/A | N/A | $36,250 [2] |

1. Original sale to Paradise Spring Associates in 1984.
2. Based on gross sales price and net comparable sole unit values.
3. REITCAL stands for Real Estate Investment Trust of California.

The $480,000.00 difference between the Kalinowski and Poulos appraisals can be attributed primarily to three areas. First, Poulos made a deduction of $205,000.00 for dated carpeting and other items characterized as "deferred maintenance." Kalinowski made no such deduction. Poulos inspected the carpet in three units; Kalinowski none. Don Folger of Real Estate Investment Trust of California ("REITCAL") inspected a number of units and found that the carpets did not need immediate replacement. Both he and Kalinowski totally rejected Poulos's deductions for deferred maintenance in determining value. I conclude a deduction for deferred maintenance in the sum of $100,-000.00 is appropriate.

Secondly, Poulos made a deduction of $42,049.00 from gross income for "below market rents" when capitalizing income. While the debtor obtains a market rent on newly rented units, some of the older units have six-month leases locked into a below-market rate. Kalinowski made no deduction for below-market rents. He thought it was inappropriate and so do I. Deducting these rents results in a substantial drop in effective gross income and, in turn, value. If these rents are excluded, the effective gross income is nearly identical for both appraisals.

The parties also used different comparables. Poulos used only 1992–93 comps. Kalinowski used comps from 1991, 1992, and 1993. Poulos derived a unit price of $35,-000.00 in computing his comparable sales price by reducing his total by $209,000.00 for "deferred maintenance." Kalinowski used a unit price of $36,000.00 with no reduction.

I conclude that the deductions from the final market value by Appraiser Poulos were excessive. With the project 100% leased and achieving market rents for newly rented units, the amount of deferred maintenance was substantially overstated. His deduction for below-market rents was not substantiated by buyers in the marketplace, i.e., REIT-CAL. The comparable sales favor Kalinowski's higher unit price because the overall trend of the Phoenix marketplace is substantially up. Both appraisers agree the property will continue to appreciate rapidly due to

the recovery taking place in Phoenix. Indeed, that appreciation is at the root of this litigation. Poulos was simply too conservative in his analysis of unit values. The value of the Paradise Springs apartment complex, for the purpose of confirmation, is $7,150,000.

## VI. Treatment of the Post–Petition Rents

In addition to its first deed of trust lien on the Paradise Springs apartment complex, MONY also holds a valid and perfected security interest in the rents from the complex.

Pursuant to the terms of a cash collateral agreement approved by the court shortly after Paradise Springs filed bankruptcy, MONY has been receiving net rents, after operating expenses, post-petition. As of June 7, 1993, MONY had received $1,018,371 in cash collateral (see MONY's Post–Trial Memorandum, at p. 5). MONY argues that the value of its secured claim, for purposes of confirmation, is determined by adding these post-petition rents to the value of the Paradise Springs apartment complex. Adding the value of the apartment complex, $7,150,-000, to the net rents, $1,018,371, the value of its collateral at the time of the confirmation hearing, under MONY's theory, is $8,168,371.

Paradise Springs, on the other hand, contends the value of MONY's collateral is limited to the value of the apartment complex, which should be further reduced by the net rents MONY received post-petition. Under Paradise Springs' theory, the value of MONY's secured claim at confirmation would be $6,131,629 ($7,150,000 − 1,018.371), and the debtor would have immediate equity in the complex.

Both parties contend support for their positions is found in *United Savings Ass'n v. Timbers of Inwood Forest*, 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988). In that case, the Court discussed 11 U.S.C. § 552(b), a provision that allows the security interest of creditors such as MONY to reach post-petition rents, as follows:

> Section 552(a) states the general rule that a prepetition security interest does not reach property acquired by the estate or debtor postpetition. Section 552(b) sets forth an exception, allowing postpetition "proceeds, product, offspring, rents, or profits" of the collateral to be covered only if the security agreement expressly provides for an interest in such property, and the interest has been perfected under "applicable nonbankruptcy law." Section 552(b) therefore makes possession of a perfected security interest in postpetition rents or profits from collateral a condition of having them applied to satisfying the claim of the secured creditor ahead of the claims of unsecured creditors. Under petitioner's interpretation, however, the undersecured creditor who lacks such a perfected security interest in effect achieves the same result by demanding the "use value" of his collateral under § 362. It is true that § 506(b) gives the *over* secured creditor, despite lack of compliance with the conditions of § 552, a similar priority over unsecured creditors; but that does not compromise the principle of § 552, since the interest payments come only out of the "cushion" in which the oversecured creditor *does have* a perfected security interest.

*Id.* at 374, 108 S.Ct. at 632 (citations omitted, emphasis in original).

Of the post-*Timbers* cases which discuss application of post-petition rents, only one has reached the conclusion advanced by MONY. In *In re Landing Associates, LTD.*, 122 B.R. 288 (Bankr.W.D.Tex.1990), the court determined that the value of a secured creditor's collateral, for plan purposes, would be established by adding the net post-petition rents in which the creditor held a perfected security interest to the value of the real and personal property also securing its claim. Although at first blush *Landing Associates* seems right on point, it is factually distinguishable because at the time of the valuation hearing the secured creditor had not received the net post-petition rents. The parties stipulated in that case that the "cash on hand after expenses ('net cash collateral')" was $784,971.48. *Id.* at 291. This factual distinction alters the valuation result.

MONY's situation is more like that of the secured creditor in *In re Bloomingdale Partners*, 155 B.R. 961 (Bankr.N.D.Ill.1993). In that case, creditor John Hancock Mutual Life

Insurance Company (Hancock) was secured by both real property and post-petition rents. Hancock had been receiving the net rents, after operating expenses, up to the time of the confirmation hearing. Like MONY, Hancock made a § 1111(b) election. The debtor's plan proposed to set the present value of Hancock's secured claim at $10,000,-000 which was the value of the real estate collateral only, less the net rents which Hancock had already received. The court noted that any increase in the value of collateral during bankruptcy accrues to the benefit of the secured creditor, citing *Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 778, 116 L.Ed.2d 903 (1992). The court then stated:

> Taken together, sections 506(a) and 552(b) require that Hancock's post-petition security interest in rents be added to its separate security interest in the Property. Not counting Hancock's security interest in rents would render § 552(b) a "practical nullity and theoretical absurdity."

> The Debtor's plan proposes to pay Hancock the present value of $10,000,000 and the balance of its allowed claim at maturity. While the amount of Hancock's "allowed claim" cannot increase during the pendency of the case, its "secured claim" can. Technically, *but for the post-petition payments of rents by the Debtor, the value of Hancock's security interests would have been commensurately higher and entitled to present value payments under § 1129(b)(2)(A)(i)(II). The plan would be deficient for not treating the post-petition rents as additional collateral; but, because the Debtor already has paid Hancock several hundred thousand dollars and Hancock has been able to reinvest those sums, the cram-down requirement for that amount has been met—in effect, prepaid.*

*Id.* at 976 (emphasis added, citations omitted). The court concluded that because Hancock had already received the post-petition rents, the present value of its secured claim at confirmation was limited to the value of the real property, while the amount of its allowed claim was Hancock's "full prepetition claim."

A similar result was reached by the court in *In re Flagler–At–First Associates, Ltd.,* 114 B.R. 297 (Bankr.S.D.Fla.1990). In that case, Foremost was an undersecured creditor holding a wrap-around mortgage on the debtor's real property. Foremost was the only creditor also collateralized by the rents in the property. Under the terms of an agreed cash collateral order, Foremost had received approximately $440,000 of the post-petition rents as adequate protection payments. The balance of the rents were applied to operating expenses and to service the debts of the other mortgagees on the property whose notes were "wrapped" by Foremost's. The debtor attempted to have Foremost's secured claim reduced by the amount of the payments which Foremost had received post-petition, arguing that since Foremost was an undersecured creditor, it was not entitled to receive interest on its claim. The court disagreed, noting that to accept the debtor's position "would require the conclusion that Foremost has no interest in the post-petition rental revenues generated by the building." *Id.* at 299. In considering how to apply the post-petition payments, the court commented:

> [T]he post-petition payments are to be applied to principal, *after* taking into account that Foremost's secured claim includes the excess rents generated and paid to Foremost during the Chapter 11. 11 U.S.C. § 522(b). Flagler's position totally ignores Foremost's rights to these rents. The result is essentially a "wash" in that the additional collateral value represented by the excess rents is to be set-off by the fact that Foremost has already received them during the course of the Chapter 11. No further reduction of the Foremost secured claim is appropriate.

*Id.* at 302.

A similar analysis was reached by the court in *In re Vermont Inv. Ltd. Partnership,* 142 B.R. 571 (Bankr.D.Dist.Col.1992). In that case, an undersecured creditor had been receiving net post-petition rents during the pendency of the Chapter 11 case. At a relief from stay hearing, the debtor argued that these payments should be applied against the principal amount of the creditor's

claim, creating an equity cushion in the real property. The court disagreed, stating:

> The debtor's argument fails to recognize that rents are collateral distinct from the underlying real estate and that post-petition interest accruals may be collected from such rent collateral by virtue of 11 U.S.C. § 552(b). Because the rents received by the bank provided additional collateral, the rents—in equal amounts—both increased the bank's allowed secured claim under 11 U.S.C. § 506(b) by virtue of post-petition interest accruals and, by payment, decreased the bank's allowed secured claim.

*Id.* at 573. The court reviewed the discussion of § 552(b) contained in the *Timbers* decision and concluded:

> This is clear *dicta* that post-petition payments to a secured creditor who possesses a security interest in rents are payments on account of a *separate and distinct item of collateral*, apart from the underlying real estate which also secures the creditor's claims and which generates such rents.

*Id.* at 574 (emphasis in original).

All of the above cases recognize that post-petition rents are collateral distinct from the real property which generates them. However, with the exception of *Landing Associates*, the courts in these cases held that the value of the secured claim was, essentially, the value of the real property. In none of the cases where the secured · creditor was actually receiving the post-petition rents was the value of its claim increased by the amount of the post-petition rents. Rather, the courts found that since the creditor was already receiving the rents, the impact on valuation was basically a "wash."

There is another line of cases which has reached the conclusion that post-petition rents should be credited against a secured creditor's claim. In *Matter of IPC Atlanta Ltd. Partnership,* 142 B.R. 547, 559 (Bankr. N.D.Ga.1992), the court discussed application of post-petition rents as follows:

> Freddie Mac's argument that it should be able to keep the post-petition payments without crediting the amount received to the claim would allow Freddie Mac, an undersecured creditor, to receive the entire amount of its claim pursuant to the terms of the plan, and in addition, the post-petition payments paid by Debtor. Thus, Freddie Mac would be receiving more than its claim. This, in effect, would allow Freddie Mac to receive interest payments or use value, in direct contravention of *Timbers* and § 506(b) of the Code.

The court relied on *In re Reddington/Sunarrow Ltd. Partnership,* 119 B.R. 809 (Bankr. D.N.M.1990), which also concluded that *Timbers* required the post-petition rents to be credited against the secured creditor's claim.

■ I disagree with the conclusion of the *Reddington/Sunarrow* and *IPC Atlanta* courts. A close reading of § 552(b) and the dicta in *Timbers* cited above supports the conclusion reached by the courts in *Bloomingdale, Flagler–At–First,* and *Vermont Investments.* An undersecured creditor with a security interest in postpetition rents may, pursuant to § 552(b), retain those rents as separate collateral without crediting them against the value of the real property collateral. To hold otherwise would, as noted above, render § 552(b) "a nullity."

■ Applying the foregoing to the instant case, the net rents received by MONY will not be applied to either increase or decrease the present value of MONY's claim. The cramdown requirement for the net postpetition rents has been met because MONY has already received them. Because of MONY's § 1111(b) election, the allowed amount of its claim, for purposes of 11 U.S.C. § 1129(b)(2)(A)(i)(II), is the full amount of its prepetition claim, or $7,798,391.00. The present value of MONY's allowed secured claim is limited to the value of the apartment complex, $7,150,000.

## VII. *Interest Rate and Feasibility*

### A. *Interest Rate*

The Ninth Circuit has considered the issue of cramdown interest rates in chapter 12 cases. The issue is identical to that faced by courts in chapter 11 cases. In *In re Fowler,* 903 F.2d 694, 697 (9th Cir.1990), the court

stated, when dealing with interest rate questions in a chapter 12:

"While the cases considering the issue are fairly uniform in agreeing that a market rate of interest is appropriate, the cases differ drastically in their interpretation of how a 'market' rate is to be determined." 5 *Collier on Bankruptcy* ¶ 1225.-03[4][c], at 1225–21. Courts have used two approaches.

One is for the court to determine the current market interest rate for similar loans in the region. *See, e.g., Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982) (interpreting the identical cramdown provision in Chapter 13); *In re Shannon,* 100 B.R. 913, 938–39 (S.D.Ohio 1989) (indicating that "this approach is the most widely held among the courts in various jurisdictions"). Under this approach, the court sets the cramdown rate by taking testimony on current market rates regarding loans for the length of time involved secured by the type of property involved. 5 *Collier on Bankruptcy* ¶ 1225.03[4][c], at 1225–22.

The second method for determining the appropriate market rate is the use of a formula. Under this approach, the court starts with a base rate, either the prime rate or the rate on treasury obligations, and adds a factor based on the risk of default and the nature of the security (the "risk factor"). *See, e.g., Patterson,* 86 B.R. at 228; *Shannon,* 100 B.R. at 937. We approved the use of the formula approach in [*In re*] *Camino Real,* 818 F.2d [1503] at 1508. [ (9th Cir.1987) ]

The parties in this case have mixed the two approaches together somewhat. First, they determined a market rate of interest for a standard 75% commercial real estate loan with a 30–year amortization and a 10–year call. The parties concurred in their analysis of such a loan. Both Jeffrey Covill for MONY and Elliott Pollock for the debtor used a base rate of 8% for their cramdown analysis. This figure was based roughly on a long-term U.S. government treasury bond

rate of about 5.7% and approximately 230 basis points.

The parties differ widely on their ultimate conclusions, however. Pollock concluded a weighted rate of 8.4% would be appropriate for the debtor. Covill considered a range of rates from 10.5% to 13.6% to be reasonable. The key to the parties' differences lies in their treatment of the 25% "unconventional" portion of the loan. Pollock weighed the 25% balance at 12% and further discounted the weighted average back to a market rate after 4 years. After 4 years, he concluded, the loan would be back to the normal market rate of 8% because the project would have a 25% equity at the time. His analysis follows using a value of $6,750,000.00:

| | |
|---|---:|
| 75% of Value: | $5,062,500 |
| Balance of Loan: | 1,687,500 |
| Total Loan: | 6,750,000 |
| 75% Portion @ 8% | $ 405,000 |
| Balance @ 12% | 202,500 |
| | 607,500 |
| Weighted Average Interest Rate: | 0.090 |
| 9.0% × 4 Years: | .036 |
| Market Rate × 6 Years | .048 |
| | .084 |
| Average for 10 Yr. Loan: | 0.084 |

Covill did not further discount the loans once his weighted loan rates were determined. His determinations of best case and worse case loan rates were as follows:

Best Case

| Conventional Loan Rate: | 8% × .75 | = 6.0% |
|---|---|---|
| High Risk Loan Rate: | 18% × .25 | = 4.5% |
| Weighted Average Loan Rate: | | 10.5% |

Worst Case

| Conventional Loan Rate: | 19% × .65 | = 5.9% |
|---|---|---|
| High Risk Loan Rate: | 22% × .35 | = 7.7% |
| Weighted Average Loan Rate: | | 13.6% |

■ Since no lender will make 100%–to-value loans, both experts have attempted to utilize a method which examines risk upon the nonmarket 25% equity and arrive at a fair overall interest rate. This process is speculative but necessary for determination of an appropriate cramdown rate. By exam-

ining risk, I hope to arrive at a weighted rate reflective of the marketplace.

There are a number of factors that both decrease and increase risk to MONY as a secured party. First, Paradise Springs is in an excellent location, both nationally and locally. Phoenix in general is making a strong comeback from the economic problems of the past five years. The project now has nearly 100% occupancy, and has been well maintained in general. Very few rental units have been added to the Phoenix area inventory for the past five years. The demand for the units, the rents, and the overall value of the project have increased substantially over the last year due to a low supply and high demand. The outlook for the foreseeable future is very bright.

Looking at the negative side, there remains risk associated with the project. The project is 100% leveraged. There is little equity upon which to draw for unforeseen vacancies or unexpected capital demands if something goes wrong. Secondly, the initial $300,000.00 to be contributed by MIRI will only provide a $78,000.00 cash reserve. Given the size of this project, that is a very small margin. Moreover, the real estate market in Phoenix is cyclical. It is possible that Phoenix could return to its recessionary status of the 1980s. The debtor's small amount of cash and small equity are not likely to weather a major economic storm.

■ Despite these possible problems, I assess the risk of future default on this project to be low. With the exception of the first year, the long-term prospects look good. My assessment is based on both appraisers' optimistic long-term view of the Phoenix area through the term of a 10–year loan. The nature of the security at this time is excellent. Paradise Springs is a hot project. The real property has no vacancies, appeals to an affluent segment of the population, and is in an excellent location. It is well maintained. The property is in demand and readily marketable for cash. It has curb appeal, has appreciated substantially, and will likely continue to appreciate for the foreseeable future.

The interest rate experts assigned a range of approximately 12% to 22% in the weighing process for the 25% equity portion of the loan. Because I view the overall risk of default to be low, except for the first year, and the collateral to be excellent, I will assign a rate of 13% to the equity portion of the loan, resulting in a weighted rate of 9.25%:

| | | |
|---|---|---|
| Conventional Loan Rate: | $8\% \times .75$ | $= 6.0\%$ |
| High Risk Loan Rate: | $13\% \times .25$ | $= \underline{3.25\%}$ |
| Weighted Average Loan Rate: | · | $9.25\%$ |

■ Elliott Pollock reduced the rate again in his weighing process based upon a four-year equity buildup. I agree with Mr. Covill that such a reduction is inappropriate in determining a market interest rate for a loan. Therefore, I will not re-weigh the rate to determine an average rate for a 10–year loan.

Essentially, 9.25% represents a hybrid between the current market rate and formula approaches approved by the Ninth Circuit in *Fowler*. Through use of a formula the parties have synthesized a market rate of interest for a 100% to value loan even though such loans are not available in the marketplace. Alternatively, based upon a base rate of 5.7% on long-term treasury obligations, the parties have added a risk factor though a formula to determine an appropriate rate. From my viewpoint, that risk factor amounts to 3.55% over the treasury bond rate.

### B. *Feasibility*

■ Despite overcoming a number of legal hurdles, the debtor has been unable to overcome the final hurdle of feasibility. The plan as submitted is not feasible under 11 U.S.C. § 1129(a)(11). I find the debtor's projections to be reasonable. Utilizing those projections, which include a 10% increase in first year rents, the debtor still does not have enough funds to complete payments under the plan during the first year. The problem is illustrated below:

| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 |
|---|---|---|---|---|
| Net Income | $601,384 | $698,001 | $714,512 | $731,292 |
| Total Debt Service | 705,876 | 705,876 | 705,876 | 705,876 |
| Net Cash Flow | (104,492) | (7,875) | 8,646 | 25,416 |
| Equity Contribution | 78,200 | 48,708* | –0– | –0– |
| Cash on Hand | (26,292) | 40,833 | 49,479 | 74,895 |

* Second year contribution of $75,000 less first year deficit of $26,292.

While the problem is quickly remedied in the second year, there are insufficient funds on hand to service the outstanding secured claim at the value and interest rate allowed by the court, even after application of first year reserves of $78,200.00. While the debtor could possibly cure the default with its second year equity contribution, I simply cannot find the existing plan feasible under such circumstances. The debtor has simply failed to adequately capitalize the project. The margin for error is too great.

█ Other than the first year cash deficiency problem, the balance of the plan is feasible. Cash reserves increase substantially through the years. I reject the notion that feasibility of the plan must be determined by clear and convincing evidence. The preponderance of the evidence test is proper. I further reject MONY's contention that the plan is not feasible based upon the testimony of Mr. Jay Pulis. He did very little to aid the MONY cause because his assumptions were wrong.

█ Finally, it is my view that a modification of the plan appropriately increasing the initial capital contribution would not be such a material modification that MONY would be entitled to withdraw its § 1111(b) election.

## VIII. *Conclusion and Order*

This plan, while not feasible in its present form, can easily be modified to overcome its deficiency. Therefore, IT IS HEREBY ORDERED:

1. Confirmation of the May 22, 1992, plan submitted by the debtor is denied.

2. The debtor is granted a 30–day period in which to amend its plan and disclosure statement.