115 F.3d 650
 30 Bankr.Ct.Dec. 1136, 97 Cal. Daily Op. Serv. 3966,
97 Daily Journal D.A.R. 6746
 In re AMBANC LA MESA LIMITED PARTNERSHIP, Debtor.
LIBERTY NATIONAL ENTERPRISES, a California limited
partnership, Creditor-Appellant,
v.
AMBANC LA MESA LIMITED PARTNERSHIP, an Arizona limited
partnership, Debtor-Appellee.
 No. 95-16872.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 7, 1996.
Decided May 28, 1997.
 
 Sean P. O'Brien, Frank G. Long, Gust Rosenfeld, Phoenix, Arizona, for creditor-appellant.
 Ilene J. Lashinsky, Davis & Lowe, Phoenix, Arizona, for debtor-appellee.
 Appeal from the United States District Court for the District of Arizona; Paul G. Rosenblatt, District Judge, Presiding. D.C. No. CV-92-00896-PGR.
 Before RONEY,* BEEZER and TROTT, Circuit Judges.
 RONEY, Senior Circuit Judge:
 
 
 1
 Liberty National Enterprises, the only secured creditor in this single-asset bankruptcy of a 256-unit apartment project, appeals the confirmation of a Chapter 11 plan of reorganization which utilized the "cramdown" provisions of 11 U.S.C. § 1129(b) of the Bankruptcy Code. We reverse on two grounds.
 
 
 2
 The bankruptcy court first, erroneously failed to include cash collateral, the sum of rents accumulated less operating expenses at the time of the confirmation of the Plan, in the present value securing Liberty's claim; and second, violated the absolute priority rule, which would provide interest on that portion of Liberty's claim classified as unsecured before any equity interest would revert to the bankrupt, because the "new value" approved by the court as justifying such a violation was not substantial.
 
 
 3
 Ambanc is a limited partnership formed in June 1988 to purchase, operate, hold, and ultimately dispose of a single asset: a 256-unit apartment project in Mesa, Arizona. Ambanc purchased the property with funds borrowed from Liberty's predecessor in return for a note in the principal amount of $7.6 million, secured with a deed of trust covering the property. As of May 1990, the Chapter 11 petition date, the amount of the claim secured by the note and deed of trust was $8,344,920. The bankruptcy court valued the real property at $4.3 million. The bankruptcy court also entered an order providing that the RTC, which at that time owned the note, had a properly perfected interest in all rents and revenues gathered at the property, that these funds are cash collateral under 11 U.S.C. § 363(a), and that all net income from the rents and revenues, generated at the property and beyond those necessary to pay the normal operating expenses of the property, are to be segregated by Ambanc in an interest-bearing account. In March 1992, the bankruptcy court confirmed Ambanc's Plan of Reorganization.
 
 THE PLAN
 
 4
 The Plan establishes eight separate classes of creditors: three classes of administrative expense or priority claims; one class, Class 4, composed of Liberty's secured claim; and four unsecured classes:
 
 
 5
 Class 5, Liberty's unsecured claim $4,044,920
 Class 6, Crain's unsecured claim $ 618,482
 Class 7, trade creditors' claims $ 28,233
 Class 8, Security Savings & Loan Assoc.'s claim $ 303,801
 
 
 6
 The Plan defers all payments on claims until the effective date: the first business day occurring at least 30 days after the confirmation order has become final and nonappealable. Finally, the Plan defines classes 9 through 11, which provide that Ambanc's partners who contribute $20,000, payable over 10 years in annual increments of $2,000, will retain all of their interest in the reorganized debtor.
 
 
 7
 The Plan treats Liberty's claims as follows. The Plan pays no interest on Liberty's class 4 secured claim between the March 1992 confirmation and the effective date. On the effective date, the Plan will offset all of Liberty's accumulated cash collateral against the $4,300,000 principal of Liberty's secured claim. The accumulated cash collateral was predicted to reach approximately $300,000 by the effective date at the time the Plan was confirmed. After offsetting the cash collateral, the Plan pays Liberty interest-only monthly payments at 10.5% per annum on the balance of the $4,300,000 secured claim. The Plan pays principal on Liberty's secured claim if there is positive cash flow and will pay the unpaid balance and accrued interest in 10 years or if the property is either sold or the underlying indebtedness is refinanced. The Plan pays Liberty's class 5 unsecured claim, without post-confirmation interest, only if there is sufficient cash flow generated after Liberty's class 4 claim is paid in full.DISPOSITION BELOW
 
 
 8
 Only class 7 of the impaired classes affirmatively accepted the Plan. The bankruptcy court confirmed the Plan over the RTC's predecessor's objections. Liberty subsequently obtained the RTC's interest in the note. The district court affirmed more than two years later in September 1995. This appeal followed.
 
 DISCUSSION
 
 9
 On appeal from a final judgment of the district court reviewing a decision of the bankruptcy court, we review the bankruptcy court's factual findings for clear error and the district court's legal conclusions de novo. In re Barakat, 99 F.3d 1520 (9th Cir.1996).
 
 I.
 
 10
 The bankruptcy court had an affirmative duty to ensure that the Plan satisfied all 11 U.S.C. § 1129 requirements for confirmation. In re L & J Anaheim Assoc., 995 F.2d 940, 942 (9th Cir.1993). 11 U.S.C. § 1129(a) sets forth thirteen requirements to be met before the bankruptcy court may confirm a Plan. The bankruptcy court must confirm a Chapter 11 debtor's plan of reorganization if the debtor proves by a preponderance of the evidence either (1) that the Plan satisfies all thirteen requirements of 11 U.S.C. § 1129(a), or (2) if the only condition not satisfied is the eighth requirement, 11 U.S.C. § 1129(a)(8), the Plan satisfies the "cramdown" alternative to this condition found in 11 U.S.C. § 1129(b), which requires that the Plan "does not discriminate unfairly" against and "is fair and equitable" towards each impaired class that has not accepted the Plan. See In re Arnold and Baker Farms, 177 B.R. 648 (9th Cir. BAP 1994), aff'd, 85 F.3d 1415 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 681, 136 L.Ed.2d 607 (1997).
 
 
 11
 The eighth requirement provides that "with respect to each class of claims or interests-(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8). 11 U.S.C. § 1129(a)(8) is not satisfied because Liberty, an impaired class, objected.
 
 
 12
 Because 11 U.S.C. § 1129(a)(8) is not met, the Plan must satisfy the cramdown provision, 11 U.S.C. § 1129(b), to be confirmed. The two requirements for cramdown are that the plan (A) treat each objecting impaired class fairly and equitably, and (B) not discriminate unfairly against any objecting impaired class. 11 U.S.C. § 1129(b)(1). 11 U.S.C. § 1129(b)(2) sets out specific requirements for fair and equitable treatment, which the Plan does not meet in its definition and treatment of Liberty's secured and unsecured claims.
 
 A. Liberty's Secured claim
 
 13
 The 11 U.S.C. § 1129(b)(2) cramdown provision specifies that a fair and equitable plan provide one of three alternatives for the holders of secured claims:
 
 
 14
 (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
 
 
 15
 (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
 
 
 16
 (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or
 
 
 17
 (iii) for the realization by such holders of the indubitable equivalent of such claims.
 
 
 18
 11 U.S.C. § 1129(b)(2)(A). Each of these three alternatives prevents Ambanc from cramming down the Plan by paying Liberty less than the present value of the collateral securing its claim.
 
 
 19
 The Plan purports to employ the first alternative means of fair and equitable treatment, 11 U.S.C. § 1129(b)(A)(i)-deferred cash payments equal to the present value at the effective date. The value of Liberty's secured claim for the purposes of confirmation is the market value of real property plus the net amount of the rents collected post-petition and pre-confirmation and subject to a deed of trust and assignment of rents. Thus, Liberty should have been paid on its secured claim of approximately $4.6 million-$4.3 million in the value of the real property and the estimated $300,000 accumulated cash collateral by the time of the effective date. The bankruptcy court erred in finding the $4.3 million valuation of Liberty's secured claim satisfied the cramdown requirements.
 
 B. Liberty's Unsecured Claim
 
 20
 11 U.S.C. § 1129(b)(2) sets forth specific criteria for the fair and equitable treatment of unsecured claims:
 
 
 21
 (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
 
 
 22
 (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
 
 
 23
 11 U.S.C. § 1129(b)(2)(B). § 1129(b)(2)(B)'s provision for fair and equitable treatment of unsecured creditors codifies the judicially developed absolute priority rule. With one exception, that general rule prohibits the bankruptcy court from confirming the Plan if any of the debtor's former equity holders retain any equity interest in the estate without also providing to senior objecting creditors cash or other property equal to the present value of their claim. Ambanc's partners do retain equity interests, so Liberty-an unsecured creditor classified senior to Ambanc's partners-must be paid the full present value of its claim. The district court found that because Liberty "will receive 100% of both its secured and unsecured claims before the partners receive anything," the Plan satisfied the absolute priority rule. However, in order for Liberty to be paid the full value of its claims, the Plan must provide for payment of interest for the post-confirmation time-value of the amount of Liberty's unsecured claim. See In re Perez, 30 F.3d 1209, 1214-15 (9th Cir.1994). The Plan violates the general absolute priority rule provided in the Code because it does not pay interest on Liberty's unsecured claim.
 
 
 24
 Because the Plan plainly violates the general absolute priority rule, we must consider whether it satisfies the exception or "corollary," In re Bonner Mall Partnership, 2 F.3d 899 (9th Cir.1993), mot. to vacate denied and cert. dismissed, 513 U.S. 18, 115 S.Ct. 386, 130 L.Ed.2d 233 (1994). Allowing old equity to retain an interest does not violate the absolute priority rule if the former equity holders provide new value to the reorganized debtor, under the "new value corollary" to the absolute priority rule.
 
 
 25
 The new value corollary requires that former equity holders offer value under the Plan that is (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for successful reorganization, and (5) reasonably equivalent to the value or interest received. Id. at 908. Under the Plan, Ambanc's partners retain all of their rights, title, and interest in the reorganized debtor conditioned upon each partner contributing $20,000 payable over 10 years in annual increments of $2,000. With 16 contributors, this translates to an initial contribution of $32,000, and a total contribution of $320,000 over a period of ten years.
 
 
 26
 There is no dispute that the partners contribute "new" value. We reverse, however, on the ground that the bankruptcy court erred in finding the contribution substantial, the analysis of which is intertwined with the "money or money's worth" component.
 
 
 27
 The bankruptcy court's findings of fact, conclusions of law and order confirming the Plan stated only that "[e]ach impaired class has either accepted the Plan or the treatment provided by the Plan for such class is fair and equitable and does not discriminate unfairly." Order p 10(h). We find this conclusion to be clear error. See Bonner, 2 F.3d at 909.
 
 
 28
 The relevant amount for the substantiality analysis is the partners' up-front contribution. Under the "money or money's worth" requirement, the new capital contribution of the former equity holders (1) must consist of money or property which is freely traded in the economy, and (2) must be a present contribution, taking place on the effective date of the Plan rather than a future contribution. See In re Yasparro, 100 B.R. 91, 96-97 (Bankr.M.D.Fla.1989) (holding that promissory notes from the individual debtor to the unsecured creditors were future rather than present contributions and thus did not satisfy the new value corollary) (citing Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); In re Stegall, 85 B.R. 510 (C.D.Ill.1987), aff'd, 865 F.2d 140 (7th Cir.1989)). Only those contributions from Ambanc's partners that will actually be paid on the effective date of the Plan may be considered as money or money's worth under the new value corollary-the contribution of $32,000.
 
 
 29
 The Bonner case was before this Court on the district court's reversal of the bankruptcy court's grant of relief from the automatic stay. The bankruptcy court had based relief from the stay on its conclusion that the new value corollary to the absolute priority rule was no longer in effect. In affirming the district court's reversal, we first determined that the judicially-created new value corollary survived the enactment of the Bankruptcy Code in 1978. We then held that the specific record before us did not establish as a matter of law that there was no reasonable possibility that the bankruptcy judge could find the plan at issue "fair and equitable." In Bonner, there had not yet been a confirmation hearing on the reorganization plan, under which old equity was to contribute $200,000, or 6% of the unsecured debt of $3.4 million. We noted that there are "certain conceptual difficulties regarding valuation inherent in the application of the new value exception," id. at 917 n. 40, but deferred addressing valuation methodology until we might be presented with a concrete factual situation at a later date, id.
 
 
 30
 The present case still does not present us with the factual situation appropriate for the resolution of the difficult issues of valuation in the context of the new value corollary. Rather, we reject the contribution proposed here as a threshold matter because it is de minimis as a matter of law.
 
 
 31
 The most conceptually difficult prong of the new value corollary may be the fifth-equivalence, which likely requires the bankruptcy court to determine a value for the reorganized debtor to be compared with the contribution. Wholly de minimis contributions, however, simply fail the threshold analysis under the second prong, substantiality-a requirement separate and independent of equivalence, see In re Snyder, 967 F.2d 1126, 1131 (7th Cir.1992). Commentators have observed that "prior to making the time-consuming determination as to whether the new value contribution is reasonably equivalent to the value being received[-the equivalence prong], a significant number of courts have required that the new value contribution be 'substantial' in comparison to such things as" (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution. J. Ronald Trost, Joel G. Samuels, Kevin T. Lantry, Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification, CA46 A.L.I.-A.B.A. 479, 552 (1995).
 
 
 32
 There is no dividend being paid as a result of contribution in this case, and we need not now determine whether total unsecured claims or total amount discharged provides the better basis, because the contribution in this case is de minimis under either comparison. First, $32,000 is less than 0.5% of the total unsecured debt of approximately $4 million. This percentage is well below the percentage of unsecured debt that other courts have held to be insubstantial as a matter of law. Compare, e.g., In re Woodbrook Assocs., 19 F.3d 312, 320 (7th Cir.1994) ($100,000 contribution not substantial because it is only 3.8% of $2.6 million unsecured debt); In re Snyder, 967 F.2d 1126, 1132 (7th Cir.1992) ("the disparity between the contribution and the unsecured debt," at most $22,000 or 2.2% of approximately $1,000,000 unsecured claims, was "so extreme ... there [was] no need to proceed any further ...."); and In re Olson, 80 B.R. 935 (Bankr.C.D.Ill.1987) ($5,000, or only 1.56% on the $320,000 due all unsecured creditors, held insubstantial), aff'd, No. 88-4052, 1989 WL 330439 (C.D.Ill. Feb.8, 1989), with In re Elmwood, Inc., 182 B.R. 845 (D.Nev.1995) ($150,000, less than 4% of unsecured debt, approved where a higher contribution would not correct the undesirable location and crime problems associated with the primary asset, an apartment complex). Second, the contribution percentage is likely even smaller when compared to amount of debt discharged-the interest on the unsecured claims. At, for instance, the rate of interest the Plan applies to Liberty's secured claim-10.5%-potentially over ten years, this lost interest could exceed $4 million.
 
 
 33
 Rejection of de minimis contributions is consistent with longstanding precedent. The absolute priority rule arose in the early part of this century from litigation attacking collusion between shareholders and bondholders who sought to squeeze-out unsecured creditors in reorganizations of failed railroads. Bruce A. Markell, Owners, Auctions, and Absolute Priority in Bankruptcy Reorganizations, 44 Stan.L.Rev. 69 (Nov.1991). The courts initially employed fraudulent transfer principles to assist unsecured creditors. Id. at 76-77. In one early such case, Northern Pacific Ry. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913), the Supreme Court recognized two general principles: First, continued shareholder participation in the reorganized debtor creates a presumption of collusion. Id. at 507, 33 S.Ct. at 561. Second, reorganization managers could dispel this presumption by promulgating a "fair" offer to all creditors. Id. at 508, 33 S.Ct. at 561-62. Our holding in Bonner recognizes that such precedential heritage survived the later codification of the absolute priority rule. The Boyd presumption against former equity's participation has endured as a primary component of absolute priority jurisprudence. A de minimis contribution is insufficient to overcome that presumption.
 
 
 34
 We decline to define a bright-line rule, but merely hold that a proposed contribution of one-half of one percent of each of the various quantities judicially recognized as relevant to the substantiality comparison falls within the de minimis range.
 
 
 35
 Based upon the above holding, we need not reach the fourth and fifth prongs of the new value corollary, necessity and reasonable equivalence. However, if a new Plan is proposed in the future and confirmed, the bankruptcy court's confirmation order will likely need to exhibit a more comprehensive factual determination as to necessity than is present in the order under review. The court must also take care that the equivalence analysis only compares what the partners put in to what they get out.
 
 II.
 
 36
 There are two additional confirmation requirements that will merit closer consideration by the bankruptcy court if a new Plan is put forth following remand. First, the tenth 11 U.S.C. § 1129(a) confirmation requirement provides:
 
 
 37
 If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.
 
 
 38
 11 U.S.C. § 1129(a)(10). Liberty argues that the Plan unfairly discriminates against Liberty by making repayment of its unsecured class 5 claim conditional, while paying the trade creditors' class 7 claims in cash on the effective date of the Plan. Liberty contends that the only basis for paying the trade creditors 80% at the Plan's inception was to gerrymander an impaired class to vote for the Plan.
 
 
 39
 Discrimination between classes must satisfy four criteria to be considered fair under 11 U.S.C. § 1129(b): (1) the discrimination must be supported by a reasonable basis; (2) the debtor could not confirm or consummate the Plan without the discrimination; (3) the discrimination is proposed in good faith; and (4) the degree of the discrimination is directly related to the basis or rationale for the discrimination. In re Wolff, 22 B.R. 510, 511-12 (9th Cir. BAP 1982). Moreover, separate classification for the purpose of securing an impaired consenting class under § 1129(a)(10) is improper. See In re Greystone III Joint Venture, 995 F.2d 1274, 1279 (5th Cir.1991), cert. denied, 506 U.S. 821, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), and cert. denied, 506 U.S. 822, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); In re Holywell Corp., 913 F.2d 873, 880 (11th Cir.1990). In affirming on this element, the district court reasoned that "it is legitimate to pay the relatively small claims of trade creditors more quickly than a large deficiency claim" because "[p]rompt payment of such debts promotes good will and enables a debtor to continue to receive goods and services while implementing its recovery." On the other hand, the continued services of ordinary tradespeople may not always be a commercial necessity for an apartment operator in a large metropolitan area with many other providers of those services. See In re Barakat, 173 B.R. 672, 681 (Bankr.C.D.Cal.1994) aff'd, 99 F.3d 1520 (9th Cir.1996); In re Lumber Exchange Ltd. Partnership, 125 B.R. 1000 (Bankr.D.Minn.), aff'd, 134 B.R. 354 (D.Minn.1991), aff'd, 968 F.2d 647 (8th Cir.1992). If confirmation is reconsidered on remand, the trade creditors' payoff issue must be resolved by specific evidence and court findings therefrom based upon the four Wolff factors.
 
 
 40
 Second, under the best interests test, where not all creditors support the Plan, the debtor must prove that the creditors would receive as much under the Plan as they would receive in a liquidation under Chapter 7, 11 U.S.C. § 1129(a)(7). While we do not reverse on this issue, we note that if confirmation is reconsidered after remand, the bankruptcy court must make specific findings to determine whether each claim holder in the impaired classes would receive no less under the Plan than they would have received in a Chapter 7 proceeding. Kane v. Johns-Manville Corp., 843 F.2d 636, 649 (2d Cir.1988); In re M. Long Arabians, 103 B.R. 211 (9th Cir. BAP 1989) (remanding Plan to bankruptcy court for findings on 11 U.S.C. § 1129(a)(7) when "the court did not have a proper factual basis to make an informed decision").
 
 III.
 
 41
 Finally, the bankruptcy court did not clearly err in determining that the Plan is feasible on the evidence before it. See In re Jorgensen, 66 B.R. 104 (9th Cir. BAP 1986) (determination of feasibility is a factual determination).
 
 CONCLUSION
 
 42
 Neither Liberty's secured nor its unsecured claim was treated fairly and equitably to allow cramdown. The secured claim should have included the cash collateral. The unsecured claim was not given absolute priority over the partners' interests, and the partners' contribution was too insubstantial to satisfy the new value corollary.
 
 
 43
 Liberty's request for attorney's fees in this matter is denied.
 
 
 44
 REVERSED.
 
 
 
 *
 The Honorable Paul H. Roney, Senior Circuit Judge for the Eleventh Circuit, sitting by designation