**In re ARDEN PROPERTIES, INC., Debtor.**

No. 98–12312–PHX–RJH.

United States Bankruptcy Court, D. Arizona, Phoenix Division.

May 1, 2000.

John J. Hebert, Carolyn J. Johnsen, Hebert, Schenk & Johnsen, Phoenix, AZ, for Debtor.

David E. Ledyard, Faith, Ledyard & Nickel, Avondale, AZ, Janet Briggs, Martin, Bischoff, Templeton, Langslet & Hoffman LLP, Portland, OR, Pamela Kohlman Webster, Buchalter, Nemer, Fields & Younger, Los Angeles, CA, David L. Blount, Landye Bennett Blumstein, Portland, OR, Co–Counsel for National Mortgage Co.

J. Michael Rockett, U.S. Department of Justice, San Francisco, CA, for EPA.

Kathy Steuer, Assistant Regional Counsel, U.S. Environmental Protection Agency Region 9 (ORC–2), San Francisco, CA.

## Opinion On Secured Creditor's Motion For New Confirmation Trial Or For Amended Findings, Conclusions and Judgment on Confirmation

RANDOLPH J. HAINES, Bankruptcy Judge.

Secured creditor National Mortgage Co. ("National") has moved, pursuant to Bankruptcy Rule 9023, incorporating F.R.Civ.P. Rules 59(a) and (e), for a new trial on confirmation of the plan of reorganization dated December 15, 1998, as modified on May 12, 1999 (the "Plan") filed by the Debtor Arden Properties, Inc. ("Arden" or "Debtor"), or for amended findings, conclusions and judgment. After adequate notice, briefing and oral argument on April 26, 2000, the Court finds and concludes as follows.

### Procedural Background

This is a single polluted asset case. Debtor Arden owns a parcel of property in Tempe, Arizona, which has been environmentally contaminated for many years and is within a Superfund Site. The Environmental Protection Agency ("EPA") had required the Debtor to remediate the contamination and ultimately undertook to do so itself. It asserted a lien against the property in the amount of $32 million, junior to National's.

National holds a deed of trust against the property and an assignment of rents, securing a claim it asserts in excess of $1 million. A warehouse on the eastern portion of the property is leased, and Four Peaks Brewery is the primary tenant of the western portion. The tenants generate a net operating income for the Debtor in the range of $150,000 to perhaps $175,000 per year. The Court approved a cash collateral order on October 27, 1998, which provided that all of the rents, which constituted all of the Debtor's income, were National's cash collateral, permitted the Debtor to use some of the rents to maintain and operate the property according to an agreed budget, and required the Debtor to make "adequate protection" payments to National in the amount of $5300 per month.

Debtor's plan of reorganization provided that National's secured claim would be paid over 15 years, based on a 30 year amortization, with interest at 10%. Because Debtor contended that National's total claim of $1 million was undersecured, the Plan provided for National's deficiency claim, pursuant to Bankruptcy Code § 506(a), to be treated in the unsecured claim class, Class 3. Also in that class was the EPA's $32 million claim. The Plan, as modified, provided for that claim to be allowed in the amount of $15.95 million. The modified Plan provided for the unsecured creditor class to be paid 2.35% of the allowed claims in installments over eight years, without interest. It also provided that unsecured creditors would have liens against the property securing the full amount of their claims, but only until all Plan payments had been made. EPA voted in favor of the Plan and its large monetary vote, together with some votes from

smaller creditors, provided the requisite vote for that class to have accepted the plan pursuant to § 1126(c). National voted its secured claim against the Plan and objected on several grounds.

Bankruptcy Judge Robert G. Mooreman heard four days of evidence on the confirmation hearing on May 26, June 3 and 15 and July 21, 1999, following which Arden and National submitted extensive post-trial memoranda in February, 2000. Judge Mooreman issued a 16 page Order Re: Confirmation and Valuation of Debtor's Asset (the "Confirmation Order") on March 16, 2000, which was also the last day of his term as a U.S. Bankruptcy Judge. The Confirmation Order found the value of the Debtor's real property to be $300,000 and set the amount of National's secured claim at $300,000, concluded that all requirements for confirmation were satisfied, overruled National's objections, granted confirmation of Debtor's Plan, and directed Debtor's counsel to lodge a separate form of order consistent with the Confirmation Order to serve as the final order on confirmation. I signed that order on March 29, 2000, having commenced my term as Judge Mooreman's replacement on March 17, 2000.

On March 30, 2000 National filed its Motion for New Trial and For Amended Findings of Facts and Conclusions of Law and Entry of New Judgment, along with a memorandum, subsequently amended, to which the Debtor responded. I heard oral argument on the Motion for New Trial on April 26, 2000. Although findings, conclusions and a ruling were issued from the bench, this Opinion amplifies them and is intended to constitute the findings and conclusions underlying the formal order being entered simultaneously.

## Issues Presented

National's Motion for New Trial essentially makes four basic points, summarized here in the order they will be dealt with.

First, National argues that its secured claim should not be limited to the value of the real property securing its debt, but should also include the debtor's cash collateral on hand at the time of confirmation, which National estimated at approximately $180,000.

Second, National sought a new trial on the ground of newly discovered evidence, submitting an affidavit stating that the property tenant would purchase the property for $1.5 million, provided that it could be relieved of any liability to the EPA to clean up the environmental contamination. It is the existence of this contamination and the Debtor's actual cleanup liability, and the hypothetical cleanup liability of either National or any potential purchaser, that gives rise to the most hotly disputed issue in the confirmation process, the valuation of the real property.

Third, National argues that Judge Mooreman made a manifest error of fact or law in determining the value of the real property, asserting that it should have been in the range of $1.3 to $1.57 million, based on the capitalized value of the income stream the property was producing, and ignoring any potential liability for environment cleanup costs.

Finally, National argues that the Plan should not be confirmed because it is not "fair and equitable" and violates the absolute priority rule.

## Legal Standard

Especially since National's motion requires another judge to review the trial judge's findings and conclusions, it is important to adhere strictly to the legal standard for Rule 59 motions. "A motion for reconsideration under Rule 59(e) 'should not be granted, absent highly unusual circumstances, unless [the trial court] is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.'" *McDowell v. Calderon,* 197 F.3d 1253, 1255 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1708, 146 L.Ed.2d 511 (2000), *quoting 389 Orange St. Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir.1999).

Similarly, "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly. There are four basic grounds upon which a Rule 59(a) motion may be granted. First, the movant may demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based. Second, the motion may be granted so that the moving party may present newly discovered or previously unavailable evidence. Third, the motion will be granted if necessary to prevent manifest injustice.... Fourth, a Rule 59(e) motion may be justified by an intervening change in controlling law." *McDowell,* 197 F.3d at 1255, n. 1, *quoting* 11 WRIGHT, FEDERAL PRACTICE AND PROCEDURE § 2810.1 (2d ed.1995).

■ It is neither appropriate nor permissible for this judge to substitute his judgment for that of the trial judge absent newly discovered evidence or manifest error of fact or law.

### Amount of Secured Claim Must Include Cash Collateral

■ National argues that the amount of its secured claim should not be limited to the value of the real property but also should include the amount of cash collateral the debtor had on hand at the time of confirmation, which it estimates to be $180,000. The Debtor's principal argument to the contrary is not to dispute this legal proposition, but that National failed to properly preserve the issue or to present any evidence in the confirmation hearing of either the amount of the cash collateral or that it also secured National's debt. The latter point, however, is established by this Court's cash collateral order of October 27, 1998, which is law of the case.

■ The law in this Circuit is clear that when a creditor is secured by income producing property, when its lien extends to the rents or other income generated by the property, and when the value of the real property alone is less than the amount of the claim, then the amount of the secured claim determined pursuant to § 506(a) includes both the value of the real property and the amount of the accumulated cash collateral. That is precisely the holding of *Liberty Nat. Enter. v. Ambanc La Mesa Ltd. Partnership (In re Ambanc La Mesa Ltd. Partnership),* 115 F.3d 650, 654 (9th Cir.1997), *cert. denied,* 522 U.S. 1110, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998): "The value of [the secured creditor's] secured claim for purposes of confirmation is the market value of real property plus the net amount of rents collected post-petition and pre-confirmation and subject to a deed of trust and assignment of rents." [1]

Even if this issue had not been argued by National before or during the confirmation hearing it is this Court's "affirmative duty to ensure that the Plan satisfied all 11 U.S.C. § 1129 requirements for confirmation," *id.* at 653, based on the record before it. But National did preserve the issue, because it stated in its pretrial state-

---

**1.** This holding adopts what one court called the "addition" approach, because the amount of the collected rents are added to the value of the real property to determine the amount of the undersecured claim. *See In re Union Meeting Partners,* 178 B.R. 664, 674–75 (Bankr.E.D.Pa.1995). This approach means that the amount of the undersecured claim may grow during the pendency of a case. *See In re Landing Assocs., Ltd.,* 122 B.R. 288 (Bankr.W.D.Tex.1990). There is another line of authority, called the "subtraction" cases, where collected rents are regarded as an integral part of the real property collateral and therefore are subtracted from the undersecured claim to the extent they are paid to the creditor during the pendency of the case. *See, e.g., In re Barkley 3A Investors, Ltd.,* 175 B.R. 755 (Bankr.D.Kan.1994). But in *Ambanc* the Ninth Circuit clearly adopted the "addition" approach, as has the only other circuit to address the issue, *Financial Sec., Assurance Inc. v. T–H New Orleans, Ltd. Partnership (In re T–H New Orleans Ltd. Partnership),* 116 F.3d 790 (5th Cir.1997), and as had both the Arizona District Court and this Court. *Mutual Life Ins. Co. of New York v. Patrician St. Joseph Partners, L.P. (In re Patrician St. Joseph Partners, L.P.),* 169 B.R. 669 (D.Ariz.1994); *In re Paradise Springs Associates,* 165 B.R. 913 (Bankr.D.Ariz.1993).

ment dated May 24, 1999: "National Mortgage suggests that for purposes of this [confirmation] hearing, the Court value the Real Property, the cash on hand of approximately $100,000, and insurance proceeds of $11,000 to determine security of National Mortgage Co. The parties agree that these three items form the basic security which National Mortgage holds." Debtor's pretrial statement filed the same day agreed: "National claims its secured claim encompasses additional collateral as follows: cash collateral in Debtor's account, insurance proceeds of $11,000.... Debtor agrees that the cash at confirmation is part of National's collateral. There is already a Court order requiring the insurance proceeds to be placed in the Debtor-in-possession account."

It is apparently true that no evidence of the amount of the cash collateral was presented during the course of the confirmation hearing, but none was really needed. The parties agreed that the Debtor's cash on hand all constituted National's cash collateral, and the Debtor each month filed a monthly operating report as required by §§ 704(8), 1106(a)(1) and 1107(a), which included a report of the amount of cash on hand at the end of each month. A court is always permitted to take judicial notice of the contents of its own files, either in the same or in another case. *U.S. v. Author Services, Inc.,* 804 F.2d 1520, 1523 (9th Cir.1986) *as amended by,* 811 F.2d 1264 (9th Cir.1987); *U.S. v. Wilson,* 631 F.2d 118, 119 (9th Cir.1980).

It is also true that neither party addressed this issue in their extensive post-trial memoranda. National devoted 22 pages of its post-trial memorandum to its argument why it should be treated as fully secured, based on a value of the real property that it contended exceeded its claim, but never addressed how its claim should be calculated in the event the real property were valued at less than its claim. This is undoubtedly what gave rise to the oversight in the Confirmation Order in establishing its secured claim as equal only to the value of the real property. But since the parties had already agreed in their pretrial statements that the secured claim would also include the Debtor's cash collateral on hand, this is exactly the type of administrative error that Rule 59 is intended to correct, to obviate the need for an appeal. This relief particularly makes sense in light of the time necessary to resolve bankruptcy appeals—the Ambanc plan was confirmed in March, 1992, *id.* at 652, but the error in failing to add some $300,000 of accumulated cash collateral to the $4.3 million value of the property was not corrected for more than five years until the Ninth Circuit ruled in May, 1997.

■ At oral argument on the Motion for New Trial Debtor's counsel argued that if the cash collateral were to be included in the calculation of the amount of the secured claim, then the Debtor should be given credit for the $5,300 per month in adequate protection payments it had made to National pursuant to this Court's cash collateral order of October 27, 1998. Such a credit, a deduction from the principal amount of the undersecured claim, would be appropriate if the adequate protection payments had derived from some source that was not the creditor's collateral. *See, e.g., In re Wabash Valley Power Ass'n, Inc.,* 72 F.3d 1305, 1322 (7th Cir.1995), *cert. denied,* 519 U.S. 965, 117 S.Ct. 389, 136 L.Ed.2d 305 (1996). But when the payments derived from rents that were the creditor's collateral, the debtor is in effect receiving that credit. Under the rule of *Ambanc,* the secured creditor's secured claim includes the value of the real property "plus the net amount of rents collected post-petition," not just those remaining on hand at confirmation. That means that National's secured claim should also be increased by the $5,300 of additional net rents collected during each of the 17 months from the date of the cash collateral order until the Confirmation Order, for an additional $90,100. But since those funds have already been paid to National, the Debtor is given an offsetting credit in that

amount.[2] As this Court previously noted, when rents that are collateral are paid to the creditor during the case, the effect on the amount of the undersecured claim is a "wash." *In re Paradise Springs Associates*, 165 B.R. 913, 926 (Bankr.D.Ariz. 1993).

### Posttrial Affidavits Are Not Newly Discovered Evidence for Rule 59 Purposes

■ National's argument for new trial based on newly discovered evidence hinges on an affidavit signed by Dan McBeth on March 29, 2000. It states that his company, Four Peaks Brewery, Inc., which is a major tenant of the property, is willing to purchase the property for $1.5 million. One of the conditions of the sale was, "the issuance of a Prospective Purchaser Agreement exempting the purchaser, its successors and assigns, from liability related to prior contamination of the property under the terms and conditions of the usual PPA agreements of the Environmental Protection Agency."

For two independent reasons, this affidavit is insufficient to warrant a new trial.

■ First, evidence is not "newly discovered" for purposes of Rule 59 if it "could have been discovered with reasonable diligence" at the time of trial. *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208, 211 (9th Cir.1987). The affidavit is dated 13 days after the Confirmation Order, but National has made no showing, or even argument, why it could not have obtained the affidavit prior to the conclusion of the confirmation hearing, or at least prior to the Confirmation Order. Where the moving party does not make any showing that such an affida-

vit was unavailable at the time of trial, rejection of such a tardy affidavit is "well within" a court's discretion. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 892 n. 6 (9th Cir.1994).

National argues that *Weiner v. Perry, Settles & Lawson, Inc. (In re Weiner)*, 161 F.3d 1216 (9th Cir.1998), would permit such a tardy affidavit to be treated as newly discovered evidence. But the court in that case took pains to point out that the appraisal was submitted after an oral ruling by the judge but prior to entry of a final order, and the result "might be different if the bankruptcy court had not been informed of the pending trustee-ordered appraisal prior to issuing its oral ruling, and if the bankruptcy court had not been informed [of the appraisal amount] prior to entering its written order." *Id.* at 1219. Here there is no suggestion Judge Mooreman had been informed of National's efforts to obtain the affidavit prior to entry of the Confirmation Order, and the affidavit was not submitted prior to entry of the subsequent formal written order. As the Ninth Circuit suggested, the result here is therefore different.

■ Second, the newly discovered evidence must be "of such magnitude that production of it earlier would likely have changed the outcome of the case." *Coastal Transfer*, 833 F.2d at 211. Here, it is evident from both Judge Mooreman's Confirmation Order and from the parties' briefs on the Motion for New Trial that one of the key issues was whether a third party purchaser could count on being able to obtain from the EPA such an exemption from the cleanup liability. Judge Mooreman concluded, based on substantial evi-

---

**2.** Since National is undersecured, it is not entitled to interest under § 506(b). *Wabash, supra.* Consequently the payments it received must be applied to principal, rather than to interest. Thus the $90,100 in rents collected and paid over must be deducted from the principal amount of its claim that would otherwise total the value of the property ($300,-000), the rents collected and paid over ($91,-000), and the rents collected and not paid

over, *i.e.*, the approximate $180,000 remaining on hand at the time of confirmation. Calculated strictly according to the *Ambanc* formula, National's secured claim would be $570,000, but Debtor is credited for the $90,-100 in rents already paid to National, leaving a secured claim of approximately $480,000 (assuming the accuracy of the estimate of $180,000 in cash collateral on hand at confirmation).

dence, that purchasers could not necessarily rely on being able to obtain such an exemption, and therefore it was appropriate to take into account the substantial discount in the purchase price that a purchaser would require if a proposed sale did not obtain such an exemption. The McBeth affidavit provides no evidence to the contrary, since the offer is conditional upon obtaining an exemption from cleanup liability. This does not constitute evidence of what a purchaser would pay for the property without such a condition. To the contrary, it actually supports the Debtor's evidence that a purchaser would *not* be willing to purchase the property for a price equal to the capitalized value of its current income stream—the value for which National contends—without such an exemption. Consequently I cannot conclude that presentation of the McBeth affidavit during the confirmation hearing would have changed Judge Mooreman's conclusion to that effect.

### No Manifest Error In Discounting Property Value Due to Contamination

■ Judge Mooreman made extensive analysis of National's evidence and argument attempting to show that National could foreclose on the property and reap its income stream without incurring substantial EPA cleanup liability, or that it could sell the property to a third party who could obtain an exemption from such liability. But the Debtor presented substantial evidence to the contrary, not only from its own expert witness but also from admissions of National's expert. Judge Mooreman's conclusions from that evidence and analysis are fully explained in the Confirmation Order, and need not be repeated here.

Where there is substantial factual and expert testimony supporting the trial judge's conclusions, it would be very difficult for a subsequent judge to find the trial judge committed *manifest* error in reaching those conclusions. It is not enough for this judge to conclude that he might have,

or indeed would have, reached a different conclusion based on that evidence. Rather, the showing must be that it was a clear and manifest error to rely on the evidence on which the trial judge relied. But nothing in the record, or even in National's memorandum in support of its Motion for New Trial, suggests any reason why the evidence on which Judge Mooreman relied should be given no credence. Indeed, as noted above, Judge Mooreman's conclusion that a buyer could not absolutely rely on being able to obtain an exemption from liability from the EPA is even supported by National's tardy affidavit. Even a party who is presumably intimately familiar with the property as its current tenant, and with financing guaranteed by National, is unwilling to make an offer to purchase without imposing the condition that it be relieved of the cleanup liability.

Perhaps recognizing what a heavy burden it would have to bear to demonstrate that Judge Mooreman committed manifest error of fact notwithstanding substantial evidence in support of his conclusion, National focuses most of its effort on an argument that Judge Mooreman applied the wrong legal test for value. That argument is that, at least once the plan is confirmed and Debtor makes Plan payments to the EPA of $374,825, the Debtor will be relieved of the cleanup liability and the EPA lien once the Debtor has paid the EPA $374,825 pursuant to the Plan, and therefore the Court should value the property based on the value it will have to the Debtor alone, postconfirmation, by capitalizing the Debtor's projected future income. The legal support for this approach is supposedly to be found in *Associates Commercial Corp. v. Rash,* 520 U.S. 953, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). National argues that *Rash* requires bankruptcy courts to value property as it exists in the debtor's hands and for the debtor's use, and that therefore the Court should disregard the contaminated state of the property because, postconfirmation, the debtor will be relieved of the cleanup liability to

the EPA. In short, the court should capitalize the value of the debtor's projected income stream and ignore both the contaminated state of the property and what third party buyers would pay for it in that state.

*Rash* addressed the question of whether a truck should be valued at "(1) what the secured creditor could obtain through foreclosure sale...; (2) what the debtor would have to pay for comparable property...; or (3) the midpoint between these two measurements?" 117 S.Ct. at 1882. Even the Supreme Court's statement of the question indicates that it is not going to yield the answer National argues for, since the Court does not consider the option of valuing *this* unique property to *this* particular debtor.

*Rash* adopted the replacement value standard, and rejected the foreclosure sale value. It announced this rule in very simple terms: "In such a 'cram down' case, we hold, the value of the property (and thus the amount of the secured claim under § 506(a)) is the price a willing buyer in the debtor's trade, business or situation would pay to obtain like property from a willing seller." *Id.* at 1884. This valuation method does not include any consideration of factors that are particularly unique to the debtor, such as that it has negotiated an exemption from EPA liability that no one else has, because it instead focuses on a hypothetical "willing buyer in debtor's trade, business or situation." Nor does it, contrary to National's argument, focus solely on the income stream divorced from the property itself, but rather focuses on a "like property." Thus *Rash* requires a bankruptcy court to determine what a willing buyer would pay for this Debtor's property, in its present contaminated state and carrying with it the potential CERCLA liability.

Obviously there are circumstances where a property has a unique value to a particular person that no one else could appreciate. The power plants in *In re Wabash Valley Power Ass'n, Inc.,* 72 F.3d 1305 (7th Cir.1995), for example, had unique value to that cooperative debtor because they were uniquely designed to provide power to cooperative members and because its members were bound by supply contracts. Consequently that court concluded that although the value *to its members* was 221 million, the actual going concern value based on a sale to a third party was only $190 million, and that was the appropriate value to use for purposes of §§ 506(a) and 1129(b)(2)(A). 72 F.3d at 1312.

Although decided prior to *Rash, Wabash* is consistent with it. As noted, *Rash* says nothing about a value that is unique to a particular debtor, but rather relies on what a willing third party buyer would pay. Moreover, this approach is further supported by the Supreme Court's most recent pronouncement on the subject: "the best way to determine value is exposure to a market." *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership,* 526 U.S. 434, 457, 119 S.Ct. 1411, 1423, 143 L.Ed.2d 607, 625 (1999). Here Judge Mooreman relied on evidence of how the market would value the contaminated property, and in doing so did not commit any manifest error of fact or law.

## The Absolute Priority Rule Does Not Apply to Secured Claims

National argues that, for various reasons, the plan does not satisfy the "fair and equitable" requirement of § 1129(b). National complains that the 10% interest rate applied to the deferred payment of its $300,000 secured claim is not a market rate of interest and therefore fails to provide the present value required by § 1129(b)(2)(A)(i)(II). But Debtor's witness testified the appropriate market rate would be in a range of 7½% to 9½%, and National's witness even agreed on cross examination that an appropriate rate would be 7½% to 8¾%, "after resolving a number of misguided assumptions." With such testimony, it is not manifest error to conclude that 10% provides a market rate.

 National argues that the plan is not "fair and equitable" because its fully matured secured claim will not be paid for 15 years. But the term of the repayment is not generally regarded as a "fair and equitable" issue, but rather merely limited by the proponent's ability to satisfy the "feasibility" requirement of § 1129(a)(11). When feasibility can be shown and the collateral is not depreciable, such as real estate, numerous cases have approved plans with repayment terms of 15 years or longer. *See, e.g., In re Overland Park Merchandise Mart Partnership, L.P.*, 167 B.R. 647 (Bankr.D.Kan.1994)(25 year fully amortized term); *In re River Village Assocs.*, 161 B.R. 127 (Bankr.E.D.Pa.1993), *aff'd*, 181 B.R. 795 (E.D.Pa.1995)(15 year term); *In re Kellogg Square Partnership*, 160 B.R. 343 (Bankr.D.Minn.1993)(20 year term); *In re Mulberry Agric. Enter., Inc.*, 113 B.R. 30 (D.Kan.1990)(30 year plan); *In re Benson*, 9 B.R. 854 (Bankr.N.D.Ill. 1981)(20 year extension of a two-year note). Nor is there any particular significance to the fact that the loan being extended under the plan was fully due when the bankruptcy was filed. *Mutual Life Ins. Co. of New York v. Patrician St. Joseph Partners, L.P. (In re Patrician St. Joseph Partners, L.P.)*, 169 B.R. 669 (D.Ariz.1994)(ten year term permissible even though bankruptcy was triggered by debtor's inability to make the balloon payment on a five-year note). Based on the evidence, it was not manifest error to approve a plan with a 15 year repayment term.

Finally, National argues that the plan violates the absolute priority rule, and that Judge Mooreman "erred in ruling as a matter of law that the absolute priority rule is not applicable to this case." But of course he was entirely correct. As the Supreme Court noted recently, the absolute priority rule originated in pre-Code, and indeed in pre-Act, law, but the "rule [is] now on the books as [§ 1129] subsection (b)(2)(B)(ii)." *Bank of America Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. Partnership*, 526 U.S. 434, 449, 119 S.Ct. 1411, 1419, 143 L.Ed.2d 607, 620 (1999). But that Code provision applies only to "a class of unsecured claims," and defines what is necessary to satisfy the "fair and equitable" requirement of § 1129(b)(1), which applies only to a "class of claims or interests that is impaired under, and has not accepted, the plan." In this case there was only one class of unsecured claims, and it accepted the plan, so neither § 1129(b)(1) nor § 1129(b)(2)(B) came into play. Put another way, § 1129(b) is merely an alternative to satisfying § 1129(a)(8), which was satisfied for the unsecured class by its acceptance.

National argues that even as to secured claims, the absolute priority rule means that "the dissenting secured creditor must ordinarily be paid in full before any junior class may share under the plan," quoting from *Aetna Realty Investors, Inc. v. Monarch Beach Venture, Ltd. (In re Monarch Beach Venture, Ltd.)*, 166 B.R. 428 (C.D.Cal.1993).[3] If that were the rule, it would be violated by the Debtor's plan, because the secured claim is not paid for 15 years, whereas the unsecured class receives all of its payments (2.35% of the allowed claims) within eight years.

 But that is not rule. First, as noted above, the absolute priority rule ap-

---

**3.** *Monarch Beach* relied on similar conclusions stated in *In re Miami Center Assocs., Ltd.*, 144 B.R. 937 (Bankr.S.D.Fla.1992) and *In re Lakeside Global II, Ltd.*, 116 B.R. 499 (Bankr.S.D.Tex.1989). These authorities have been discredited. *See, e.g., Corestates Bank, N.A. v. United Chem. Tech., Inc.*, 202 B.R. 33, 54 (E.D.Pa.1996)(rejecting *Monarch); Mutual Life Ins. Co. Of New York v. Patrician St. Joseph Partners, L.P. (In re Patrician St.* *Joseph Partners, L.P.)*, 169 B.R. 669, 682 (D.Ariz.1994)(secured creditor lacks standing to argue absolute priority); *In re Sagewood Manor Assocs., L.P.*, 223 B.R. 756, 773–74 (Bankr.D.Nev.1998). Indeed, this court has previously held that secured creditors lack standing to assert the absolute priority rule. *In re Paradise Springs Assocs.*, 165 B.R. 913, 920–21 (Bankr.D.Ariz.1993).

plies only to unsecured classes,[4] not to secured claims, the requirements for which are separately set forth in § 1129(b)(2)(A), which says nothing about the timing of the repayment nor any comparison to the treatment of any other class.

■ But even if the concept of § 1129(b)(2)(B) were somehow applied to secured claims, it still would not require *payment* before a junior class could receive anything; it merely means that senior classes must be fully provided for in order for junior classes to receive anything. The payment order concept of *Monarch Beach* was short lived and quickly reversed by the Ninth Circuit the following year, in *Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir. 1994). That opinion analyzed the Supreme Court's discussion of the absolute priority rule in *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988), and concluded that it meant "that provision for full present payment to senior creditors is required before payments to junior creditors may be permitted." *Johnston*, 21 F.3d at 330. But then it went on to reject the conclusion National argues for here: "Must the money be in hand at the date of confirmation to satisfy the absolute priority rule? We think not, so long as its provision is established by uncontested findings of the bankruptcy court which are not clearly erroneous, and which 'provide for' such payments in accordance with the feasible confirmed plan." *Id.* at 330–31. That is precisely what we have here—findings of the bankruptcy court, that are not clearly erroneous, that the Debtor's plan provides for full payment of National's secured claim

pursuant to a feasible confirmed plan. Such a plan does not violate the absolute priority rule, even if it were to apply to secured claims, simply because the payment term to secured creditors is longer than the payment term to unsecured creditors.

## Conclusion

Based on the foregoing findings and conclusions, National's Motion for New Trial or Amended Findings, Conclusions and Judgment should be granted only in part—the findings and conclusions must be amended to provide that the amount of National's secured claim is the $300,000 value of the real property plus the amount of cash collateral on hand in the Debtor's bank account as of the date of confirmation. In all other respects, the Motion must be denied.

---

**4.** As drafted, the partial codification of the absolute priority rule in § 1129(b)(2)(B)(ii) applies to any class of unsecured claims and to any class junior to such class. Consequently it could apply to a class of trade debt and a junior unsecured creditor class, such as subordinated debentures. But the historic absolute priority rule as developed in equity receivership law was regarded by many as applying only between unsecured creditors and equity, not between two unsecured creditor classes. *E.g., New York Trust Co. v. Continental & Commercial Trust & Savings Bank*, 26 F.2d 872 (8th Cir.), *cert. denied*, 278 U.S. 644, 49 S.Ct. 80, 73 L.Ed. 558 (1928). This was at least one of the reasons Congress felt it necessary to add the "unfair discrimination" requirement to deal with the comparative treatment of unsecured creditor classes. *See* House Report No. 595, 95th Cong., 1st Sess., U.S.Code Cong. & Admin.News 1978, p. 5787.